*Decision will be entered under Rule 155.*

DURAND A. HOLLADAY AND BLANCHE F. HOLLADAY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6781–75.    Filed June 25, 1979.

*W. Reeder Glass* and *Andrew H. Weinstein*, for the petitioners.

*Thomas R. Ascher*, for the respondent.

DAWSON, *Judge:* Respondent determined deficiencies in the Federal income taxes of petitioners as follows:

| Year | Deficiency | Year | Deficiency |
|------|-----------|------|-----------|
| 1968 | $38,914 | 1971 | $120,154 |
| 1969 | 97,519 | 1972 | 260,727 |
| 1970 | 11,403 | 1973 | 126,690 |

After concessions by respondent, the sole issue[1] for our decision is whether the allocation to petitioner of all the taxable losses of the Kings Creek Joint Venture for the taxable years 1970 through 1973 is a bona fide allocation within the meaning of section 704.[2]

---

[1]On brief, petitioners renewed their attempts to shift the burden of proof to respondent on the grounds that respondent arbitrarily issued the statutory notice of deficiency and introduced new matter within the meaning of Rule 142(a), Tax Court Rules of Practice and Procedure. This issue was fully explored in a pretrial hearing and resolved by order in respondent's favor. We find no basis for reversing that order.

[2]Unless specified otherwise, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Durand A. Holladay and Blanche F. Holladay, husband and wife, resided in Coral Gables, Fla., at the time their petition was filed in this case. Petitioners filed joint Federal income tax returns for 1968 through 1973 with the Internal Revenue Service Center, Chamblee, Ga. Blanche F. Holladay is a party to this action solely because she signed the joint return in question. Consequently, any reference to petitioner relates to Durand A. Holladay.

The development of the Kings Creek Apartments project originated before any involvement by petitioner. Charles I. Babcock, Jr. (hereinafter Babcock), during the years in question, was a developer and builder of housing. On October 18, 1968, Babcock purchased 17½ acres of undeveloped land (hereinafter the Kings Creek land) in southwest Dade County for the site of the construction of the Kings Creek Apartments. Babcock financed 90 percent of the $599,000 purchase price with purchase money mortgages and promissory notes. On the same day, Babcock transferred the Kings Creek land to Babcock Co., his personal investment company, and received in return the 10-percent downpayment and expenses that he had incurred to purchase the property. After capitalizing interest, real estate taxes, and other expenses, the total acquisition cost of the Kings Creek land was $631,533.55.

Babcock Co. prepared plans to have the Kings Creek Apartments built in three phases of 200 units each by Babcock's construction company, Babcock Builders, Inc. In the latter part of 1969, Babcock Builders, Inc., prepared the Kings Creek land for construction of the apartments by installing sewer and water lines, driveways, electric utilities, and streets at a cost of approximately $202,000. The buildings were constructed in accordance with the following schedule:

*Building No. 1 (102 units) [phase I]*

1. Permit ...................................November 25, 1969
2. Plans .....................................September 26, 1969
3. Construction began ....................December 1969
4. Construction completed ...............July 1970
5. Rental income began ..................August 1970
6. Depreciation began .....................July 1, 1970

*Building No. 2 (96 units) [phase I]*

1. Construction began ....................May 1970
2. Construction completed ...............January 1971
3. Depreciation began ....................February 1, 1971

*Building No. 3 (clubhouse) [phase I]*

1. Construction began ....................June 1970
2. Construction completed ...............January 1971
3. Depreciation began ....................January 1, 1971

*Building No. 4 (204 units) [phase II]*

1. Permit ...................................June 18, 1970
2. Construction began ....................July 1970
3. Construction completed ...............May 1971
4. Depreciation began ....................June 1, 1971

*Building No. 5 (198 units) [phase III]*

1. Permit ...................................June 18, 1970
2. Construction began ....................December 1970
3. Construction completed ...............August 1971
4. Depreciation began ....................September 1, 1971

*Cabana and pool [phase III]*

1. Construction began ....................August 1971
2. Construction completed ...............October 1971
3. Depreciation began ....................November 1, 1971

To finance the above construction, Babcock initially relied on short-term institutional financing. His long range objectives were to build the apartment project, to recover the equity that Babcock Co. had invested in the project, to earn construction and management fees, and to retain an ownership interest in the project. To attain these objectives, Babcock wished to finance the project in accordance with what he characterized as a classic builder/investor deal. Babcock hoped to provide building and management expertise, but to have most of the equity financing

provided by a third party investor. Additional funds were to be obtained by institutional debt financing.

Accordingly, Babcock prepared an economic analysis for a proposed joint venture limited partnership to develop the Kings Creek Apartments. The analysis estimated costs, revenues, and return on investment for a proposed joint venture to develop the project. The advantages of tax losses generated during the early years were noted in the economic analysis. Babcock used the analysis in several unsuccessful attempts to obtain mortgage financing from major insurance companies and equity financing from private individuals. In February 1970, Babcock submitted the economic analysis to petitioner.

Petitioner is an attorney and a graduate of both Georgia Tech., where he studied engineering, and the University of Miami Law School. From 1949 until 1962, petitioner was engaged in the active practice of law in Miami, Fla. In 1962, he and three other individuals were instrumental in forming Continental Mortgage Investors, one of the first real estate investment trusts. From 1962 until 1967, petitioner was associated with Continental Mortgage Investors as legal counsel. In 1967, the petitioner terminated his practice of law and became the president of Continental Advisors (originally named Mortgage Consultants), which was the investment adviser, loan manager, and financial recordkeeper for Continental Mortgage Investors. In 1969 and 1970, the petitioner became the senior executive of Continental Advisors. The petitioner drew a salary of approximately $50,000 per year from Continental Advisors.

By 1970, Continental Mortgage Investors had accumulated a loan portfolio of approximately $300 million. Some of the mortgage loans placed by Continental Mortgage Investors were for the construction of apartment projects similar to the Kings Creek Apartments. As a result, petitioner was very knowledgeable and experienced in financing this type of construction project.

As adviser to Continental Mortgage Investors, Continental Advisors received a gross fee based upon the size of the investment portfolio held by Continental Mortgage Investors. The petitioner's wholly owned small business corporation, Dumare Enterprises, Inc., held a 20-percent interest in Continental Advisors, which interest was its most valuable asset and major source of income. In this regard, from 1969 until 1973, the

petitioner received from Dumare Enterprises, Inc., substantial distributions of income. These distributions were as follows:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1969 | $340,141 | 1972 | $1,024,879 |
| 1970 | 676,360 | 1973 | 201,802 |
| 1971 | 709,289 | | |

The petitioner was also instrumental in the formation of Diversified Mortgage Investors, a real estate investment trust, which in 1969 had a loan portfolio of approximately $150 million. Moreover, the petitioner was president of Diversified Advisors, which was the adviser to Diversified Mortgage Investors. Petitioner was also the managing trustee of Diversified Mortgage Investors.

Petitioner studied the economic analysis and verified Babcock's business reputation by calling a number of his friends. Petitioner then physically reviewed the project, visited certain other management projects nearby, and interviewed their managers to discover information about occupancy levels and rents. For further advice, petitioner consulted his certified public accountant, Charles Hogue. Hogue advised him that to avoid personal holding company problems he should participate in the project individually instead of using his corporation, Dumare Enterprises, Inc. Hogue told petitioner that construction period interest and interest on loans obtained by him to meet his obligations to the joint venture would be deductible by petitioner. Hogue also agreed to verify Babcock's depreciation computations. Petitioner did not obtain any legal counsel at that time.

Subsequent negotiations between Babcock and petitioner culminated in an agreement to develop the Kings Creek Apartments as a joint venture. On June 1, 1970, a joint venture agreement was executed by Babcock Co. and petitioner. The agreement provided in pertinent part as follows:

### JOINT VENTURE AGREEMENT

II. BUSINESS PURPOSE.

The business purpose of the Joint Venture shall be to acquire, own, finance, develop, improve, lease, manage and otherwise operate, for investment purposes, the Land and other real and personal property related thereto, and to engage in all other activities incidental or related to any of the foregoing (the "Project"). The parties contemplate (i) that the Land is to be developed in several phases; (ii) that the first phase will be in accordance with Phase I of

Kings Creek Apartments according to plans prepared by James Dean, A.I.A., Architect, as revised November 29, 1968, said Phase I consisting of 198 apartments and a club house to be located at the easterly end of the property; (iii) that at such time as Babcock Co. has formulated construction and financial planning for a subsequent phase, it shall furnish Mr. Holladay a description thereof in form similar to the aforesaid plan of development for the first phase. The Joint Venture shall not engage in any other business without the consent of the Joint Venturers.

III. FINANCING AND OWNERSHIP.

A. *Capital Contributions.*

The contribution of Babcock Co. to the capital requirements of the Joint Venture shall be its equity in the Land, subject to all mortgages, liens, charges and to the obligation to pay for work performed on the Land and buildings located thereon, which shall produce a capital account of approximately $275,000.00 and the contribution of Mr. Holladay to the capital requirements of the Joint Venture shall be $750,000.00, of which $250,000.00 is to be in cash at or about the time of the execution and delivery of this Agreement and the balance of $500,000.00 is to be contributed during the calendar year 1970 from time to time as needed.

B. *Proportionate Interest.*

Subject to the provisions of Article III. A. hereof, each of the Joint Venturers shall have a one-half (½) interest in and to all real and personal property, monies and profits of the Joint Venture and the respective shares of the Joint Venturers in all losses, expenses, obligations and liabilities of the Joint Venture shall be as follows:

1. Before any repayment of loans to the Joint Venturers, the sum of $100,000.00 shall be distributed equally to the Joint Venturers out of the first monies available for distribution.

2. After the payments provided for in paragraph 1 any loans made to the Joint Venture shall be repaid in such a manner that the loans from the Joint Venturers shall be equalized. The first monies therefore shall be applied to pay off the loan of $1,000,000.00 to be made by Mr. Holladay to the Joint Venture together with interest thereon.

C. *Borrowing.*

Mr. Holladay agrees to lend to the Joint Venture as and when needed the total sum of $1,000,000.00 which is to be secured by a second mortgage on the project (subordinate to loans for construction and permanent financing), at the interest rate charged from time to time by the First National Bank of Miami to Mr. Holladay. The interest shall be accrued, however, for the first three (3) years from the date of the original loan. Repayment of principal and interest shall commence at the beginning of the fourth year and shall be payable in equal quarter-annual installments including principal and interest over the following five (5) year period, provided, however, that the payments required thereunder shall not be greater than the cash available after the payments to the Joint Venturers under paragraph B. 1. hereof, and further provided that the term shall be extended for the time necessary to provide full payment under this provision. The deferred interest shall not bear interest. To the extent deemed necessary or advisable, the financial requirements of the Joint Venture in excess of the sum of $1,750,000.00 (being the $750,000.00 contribu-

tion and $1,000,000.00 loan heretofore mentioned) shall be satisfied from sources outside the Joint Venture and to this end Babcock Co. and Mr. Holladay agree that such financing shall be provided by each party equally and shall not be secured by any pledge or mortgage of the assets of the Joint Venture. Nothing in this paragraph C shall give or be construed to give to either party hereto the right, power or authority to create any liability on the part of the other party hereto for the payment of any such indebtedness.

IV. DISTRIBUTION OF LOSSES AND OF PROFITS.

A. The Joint Venturers understand that for income tax purposes the Joint Venture's adjusted basis in the property contributed by Babcock Co. differs substantially from the fair market value of said property at the time of its contribution. For that reason Mr. Holladay is to bear all losses of the Joint Venture incurred during the years 1970, 1971, 1972, 1973 and 1974. Said losses shall be as finally determined for Federal income tax purposes. In determining the respective Joint Venturers' distributive shares of each item of gross income and expense, the following rules (if a loss occurs) shall be applicable for the years 1970, 1971, 1972, 1973 and 1974.

1. Each item of gross income shall be allocated equally to each Joint Venturer.

2. A percentage of each item of expense (the same percentage for each expense) will be allocated to Babcock, the total dollar amount of which will be in the aggregate an amount equal to one-half of the gross income of the Joint Venture. The remaining expenses will be allocated to Mr. Holladay.

If in any year a gain occurs or if a loss occurs subsequent to 1974, then each item of gross income and each item of expense shall be allocated equally to each Joint Venturer.

B. After payment of the monies to be paid to Babcock Co. and to Mr. Holladay and the repayment of principal and interest on the loan from Mr. Holladay as provided for in Article III and subject to the retention by the Joint Venture of a reasonable reserve, for the business of the Joint Venture or for other contingencies, all funds arising or realized from the following sources shall be divided equally between the Joint Venturers and shall be deemed available for distribution.

1. All "net receipts" which shall mean the excess of cash receipts over cash expenditures and accruals derived from the ownership and operation of the business and properties of the Joint Venture as determined in accordance with generally accepted accounting principles applicable to the business conducted by the Joint Venture, except that (i) depreciation of buildings, improvements, and personalty shall not be considered as a deduction from cash receipts, and (ii) payment in reduction of principal of any obligation secured by any property of the Joint Venture shall be considered as a deduction from cash receipts;

2. The net proceeds from the sale of any part or all of the property owned by the Joint Venture;

3. The amount, if any, by which the proceeds received by the Joint Venture from (i) permanent financing exceeds the cost of construction of completed buildings or the principal amount of construction loans, whichever is greater, and (ii) refinancing of any permanent secured debt exceeds the principal

balance of such debt immediately prior to such refinancing, less expenses incurred by the refinancing; and

4. Any other funds deemed available for distribution by the Joint Venturers to the extent permitted by law.

C. Distributions of the funds available for distribution shall be in the following order:

1. To be allocated and made available for distribution in accordance with the interest of the Joint Venturers as set forth in paragraph B. of Article III. All distributions shall be made annually or at any more frequent intervals that the Joint Venturers may select from time to time. The amount of each distribution to a Joint Venturer shall be available to that Joint Venturer and shall be charged to that Joint Venturer's capital account regardless of whether the charge creates or increases a deficit in that Joint Venturer's capital account.

2. For the purposes of this agreement, neither a reimbursement to a Joint Venturer for expenditures properly considered as costs or expenses of the Joint Venture, nor the payment by the Joint Venture of any fee to a Joint Venturer, nor the repayment by the Joint Venture of any advance to it by a Joint Venturer shall be considered a distribution of funds to a Joint Venturer; and Babcock Co. may make any such reimbursement, payment, or repayment prior to any distribution of funds to a Joint Venturer under this Article IV.

\*   \*   \*   \*   \*   \*   \*

VI. COMPENSATION AND INTEREST.

A. Except as in this Article VI provided, the personal services of the stockholders, officers and agents of the Joint Venturers shall be rendered without cost to the Joint Venture.

B. Babcock Co. shall cause a company or business organization affiliated with Babcock Co. to assume responsibility for the proper management and operation of any completed part of the planned development of the Land and such company or business organization shall be paid a monthly compensation for its duties equal to three percent (3%) of gross income. At the end of any calendar year upon three (3) months' written notice, Mr. Holladay shall have the right to have such management arrangement cancelled and upon agreement by the Joint Venturers, Babcock Co. may employ at the expense of the Joint Venture a third party to manage and operate any portion or all of the completed parts of the Land under a proper management agreement at the then going rate for such service.

C. Babcock Co. shall cause a company or business organization affiliated with Babcock Co. to assume responsibility for the initial renting of apartments as various phases of construction are completed. Services to be performed in the initial renting include providing personnel needed to rent the apartments and providing advertising, brochures, displays and other materials necessary or appropriate for renting the apartments as they are completed. Such company or business organization shall be entitled to receive as compensation for services rendered and to cover all of the various expenses described in this paragraph the sum of $200.00 per apartment actually rented. After the initial renting of a particular building has been completed, further rentals in such building shall be considered to be a function of the management and operation to be handled under the terms of Article VI. B. of this Agreement and the

management company shall handle these matters for the compensation provided in Article VI. B.

In regard to the equity financing, the petitioner, in conformance with the joint venture agreement, contributed capital to the joint venture in the total amount of $750,000. These investments were made during the period from June 10, 1970, to September 9, 1970. The petitioner also advanced loans to the joint venture in the total amount of $875,000 as follows:

| Date | Amount |
|---|---|
| Sept. 9, 1970 | $65,246.05 |
| Sept. 25, 1970 | 200,000.00 |
| Oct. 12, 1970 | 32,526.64 |
| Dec. 3, 1970 | 50,000.00 |
| Jan. 7, 1971 | 150,000.00 |
| Jan. 7, 1971 | 99,850.00 |
| June 7, 1971 | 100,000.00 |
| Nov. 2, 1971 | 177,377.31 |
| Total | 875,000.00 |

These loans were secured by a note and second mortgage on the Kings Creek real estate.

The debt and equity funds which the petitioner transferred to the Kings Creek Joint Venture were borrowed by the petitioner from the First National Bank of Miami through his small business corporation, Dumare Enterprises, Inc. These loans were unsecured because First National Bank of Miami knew that Dumare Enterprises, Inc., was generating amounts of cash income which were becoming sizeable.

The capital account of Babcock Co. was credited $275,621.77 as of June 1, 1970. The aforementioned amount represents the amount paid by Babcock Co. in acquiring the Kings Creek land and amortizing the purchase mortgage loans. Simultaneous with the formation of the joint venture, the joint venture assumed the liability for the balances on the mortgage loans owed by Babcock Co. for the purchase of the Kings Creek land. These mortgages in the amount of $355,931.78 were then paid in full by the joint venture during the period from July 31, 1970, to January 7, 1971. In addition, the joint venture reimbursed Babcock Co. approximately $202,000 for the out-of-pocket cash expenditures it incurred in developing the Kings Creek land for

construction. These payments were made with the funds invested by the petitioner in the joint venture.

At Babcock's request, a cash flow distribution provision relating to the priority return of his capital investment, which petitioner had agreed to, was not included in the agreement dated June 1, 1970. Although Babcock and petitioner had agreed that petitioner could send the agreement dated June 1, 1970, to his attorney for review, petitioner was extremely busy and did not give the agreement to his attorney until December 1970. Subsequent to review by his attorney, petitioner and Babcock Co.[3] executed a modified joint venture agreement on April 15, 1971. Under this modified joint venture agreement, after the $100,000 cash flow split between the parties, Babcock Co. was to receive a $150,000 cash flow priority payment. Thereafter, proceeds would again be divided equally between the joint venturers. Also, Babcock's construction company was to receive a $150,000 bonus over and above its 4-percent construction fee and another $150,000 if the project was completed within certain cost limits. The language of some of the other provisions was altered in the modification of the agreement, but the import of the pertinent provisions was unchanged. Petitioner and Babcock followed the terms of the joint venture agreement as modified.

As of December 31, 1970, the costs incurred in the construction of the Kings Creek Apartment complex were as follows:

| | |
|---|---:|
| Buildings | $1,322,622 |
| Furniture and fixtures | 40,781 |
| Machinery and equipment | 148,721 |
| Land improvements | 202,194 |
| Construction in progress | 2,437,426 |
| Total | 4,151,744 |

As of December 31, 1971, after the completion of the construction in October 1971, the costs incurred in the construction of the Kings Creek Apartment complex were as follows:

---

[3] By this time, Babcock Co. had changed its name to Babcock Industries. To avoid confusion, the entity is referred to as Babcock Co. throughout this opinion.

| | |
|---|---|
| Buildings | $7,912,411 |
| Furniture and fixtures | 283,372 |
| Machinery and equipment | 797,325 |
| Land development | 202,194 |
| Total | 9,195,302 |

Institutional financing for the project included the following:

(a) A Phase I $1,370,000 construction loan dated December 8, 1969, from Chase Federal Savings & Loan Association (hereinafter Chase).

(b) A Phase I $1,350,000 construction loan dated June 18, 1970, from Chase.

(c) A Phase II $2,800,000 construction loan dated June 17, 1970, from First Federal Savings & Loan Association (hereinafter First Federal).

(d) A Phase I (satisfaction) and III $5,800,000 construction loan dated February 4, 1971, from First Federal.

Petitioner was active in aiding the joint venture obtain those loans procured after the joint venture was formed. For example, on the basis of his own credit, petitioner negotiated letters of credit from the First National Bank of Miami which enabled procurement of the second loan from Chase and the loans from First Federal. These letters of credit were never called upon.

In regard to the institutional financing of phase I, on November 28, 1969, Babcock Co., through its officers Babcock, Mary Hayes Babcock (hereinafter Mrs. Babcock), and Robert M. Shermer (hereinafter Shermer) made the application for the loan. In addition to signing in their capacity as officers of Babcock Co., Babcock and Mrs. Babcock gave their personal endorsements on this loan. These full personal endorsements were required until the units of building number one were 85 percent leased for a gross rental of not less the $235,000 and, thereafter, their personal liability was reduced to 25 percent of the unpaid balance.

The June 18, 1970, loan from Chase resulted from an application made by Babcock Co. for a construction loan to build the second building of phase I. Mr. Babcock and Mrs. Babcock signed the corresponding mortgage and promissory note both in their capacities as officers of Babcock Co. and in their personal capacities. Petitioner also provided his personal liability. Full personal liability of Mr. Babcock, Mrs. Babcock, and petitioner resulted during the construction period. Thereafter, the extent of their liability was reduced to 15 percent of the unpaid balance.

In regard to the financing of phase II, Babcock submitted his

plans and specifications for phase II of the Kings Creek Apartment complex to First Federal on April 30, 1970. At that time, Babcock Co. was contemplating a joint venture with the petitioner. However, on May 12, 1970, in the interest of expediency, Babcock Co. requested that First Federal proceed with processing of the mortgage loan for Babcock Co. On June 17, 1970, Babcock Co. entered into a construction loan agreement with First Federal for the financing of phase II of the Kings Creek Apartment complex. Petitioner did not join in the loan agreement since the financial institution wished to avoid a usury problem.

The aforementioned construction loan agreement was signed on behalf of Babcock Co. by Babcock and Shermer. Babcock and Shermer, as president and secretary of Babcock Co., also signed the mortgage. Babcock signed the mortgage note. In addition, he and Mrs. Babcock provided a guaranty in which they agreed that they would be jointly and severally liable for the prompt and unconditional payment of the obligations of Babcock Co. to First Federal until the unpaid mortgage balance was reduced to $1,960,000.

From May 1970, until at least November 1970, First Federal was hesitant to undertake the financing of phase III of the Kings Creek Apartment complex because of the concern with the usury problem. By February 1971, however, First Federal decided to proceed with the financing of phase III and entered into the loan agreement with Babcock Co. and the petitioners.

As security for the $5,800,000 loan, petitioner and Babcock Co. provided a mortgage note. In addition, Babcock Co. and petitioner agreed to be jointly and severally liable for all loans that First Federal advanced for the Kings Creek project until the construction was complete and certificates of occupancy were obtained. Part of the proceeds of the phase III mortgage loan were applied toward the cancellation and satisfaction to the loans from Chase. On February 24, 1971, there remained in the phase III construction loan fund the sum of $2,942,213.63.

For each of the taxable years 1970 through and including 1973, the Kings Creek Joint Venture filed U.S. Partnership Returns, Forms 1065, with the Internal Revenue Service Center, Chamblee, Ga. Pursuant to the joint venture agreement and its subsequent modification, all of the taxable losses incurred by the Kings Creek Joint Venture for the taxable years ending

December 31, 1970, through and including December 31, 1973, were allocated to the petitioner. Petitioners claimed on Schedule E of their U.S. Individual Income Tax Returns for the taxable years 1970, 1971, 1972, and 1973 the losses allocated to petitioner by the Kings Creek Joint Venture in the following amounts:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1970 ............ | $372,412 | 1972 ............ | $617,212 |
| 1971 ............ | 971,221 | 1973 ............ | 379,364 |

For the taxable year ended December 31, 1971, the petitioners claimed a net operating loss in the amount of $267,758. On March 31, 1972, the petitioners filed an Application for Tentative Refund from Carryback of Net Operating Loss, Form 1045. On May 16, 1972, the petitioners received tax refunds for the taxable years 1968, 1969, and 1970 in the amounts of $38,914, $97,519, and $11,403, respectively.

## OPINION

The only issue for our decision is whether the allocation to petitioner of all the taxable losses of the Kings Creek Joint Venture for the taxable years 1970 through 1973 are bona fide allocations within the meaning of section 704. The Kings Creek Joint Venture was formed by petitioner and the personal investment company of Babcock for the purpose of developing the Kings Creek Apartments. The joint venture was formed after Babcock Co. had obtained the land and begun construction. Petitioner agreed to provide an equity contribution of $750,000 and loans up to $1 million as needed and was active in aiding the joint venture obtain the institutional debt financing necessary to complete the remainder of the construction. Each party agreed to share equally the burden of providing additional financing necessary or advisable for the joint venture. Under the terms of the joint venture agreement, as modified, initial equity cash distributions from the project were allocated as follows: the first $100,000 was split equally between petitioner and Babcock Co.; the next $150,000 was allocated to Babcock Co. as part of the return of its capital investment. Then, after Babcock's construction company received a construction fee bonus and petitioner's loans were repaid, petitioner and Babcock Co. were to share equally in the income generated by renting the apartments or in the proceeds upon eventual sale of the complex. Notwithstand-

ing this nearly equal division of economic benefits, the joint venture agreement purported to allocate all losses, as computed for tax purposes, to petitioner for the years 1970 through 1974, inclusive. In accordance with the agreement, for Federal income tax purposes petitioner reported losses totaling $2,340,209 for the years 1970 through 1973.

Respondent contends that the allocation of losses to petitioner is not a bona fide allocation within the meaning of section 704 since the allocation bore no relationship to petitioner's distributive share of economic profits and losses of the Kings Creek Joint Venture. Since the profits and losses were to be shared nearly equally, respondent contends, petitioner is entitled to report for Federal tax purposes only one-half of the losses of the joint venture. Petitioner, on the other hand, contends the allocation was bona fide since it was agreed to by petitioner and Babcock and was consistently followed as embodied in the original joint venture agreement. We agree with the respondent.

Partners[4] are required by section 702 to report their distributive shares of partnership income[5] but are given wide latitude by section 704 to specify via the partnership agreement what that distributive share will be.[6] Under the express language of

---

[4]Partners and partnerships are defined for purposes of Federal income taxation to include joint venturers and joint ventures, respectively. Sec. 761(a) and (b).

[5]SEC. 702. INCOME AND CREDITS OF PARTNER.

(a) GENERAL RULE.—In determining his income tax, each partner shall take into account separately his distributive share of the partnership's—

(1) gains and losses from sales or exchanges of capital assets held for not more than 6 months,

(2) gains and losses from sales or exchanges of capital assets held for more than 6 months,

(3) gains and losses from sales or exchanges of property described in section 1231 (relating to certain property used in a trade or business and involuntary conversions),

(4) charitable contributions (as defined in section 170(c)),

(5) dividends with respect to which there is provided an exclusion under section 116, or a deduction under part VIII of subchapter B,

(6) taxes, described in section 901, paid or accrued to foreign countries and to possessions of the United States,

(7) partially tax-exempt interest on obligations of the United States or on obligations of instrumentalities of the United States as described in section 35 or section 242 (but, if the partnership elects to amortize the premiums on bonds as provided in section 171, the amount received on such obligations shall be reduced by the reduction provided under section 171(a)(3)).

(8) other items of income, gain, loss, deduction, or credit, to the extent provided by regulations prescribed by the Secretary or his delegate, and

(9) taxable income or loss, exclusive of items requiring separate computation under other paragraphs of this subsection.

[6]SEC. 704. PARTNER'S DISTRIBUTIVE SHARE.

(a) EFFECT OF PARTNERSHIP AGREEMENT.—A partner's distributive share of income, gain, loss, deduction, or credit shall, except as otherwise provided in this section, be determined by the partnership agreement.

(b) DISTRIBUTIVE SHARE DETERMINED BY INCOME OR LOSS RATIO.—A partner's distributive share of

section 704(b), a partner's distributive share of any item of income is determined in accordance with his distributive share of taxable income or loss unless the partnership agreement provides special allocations, in which case the allocations are effective for Federal tax purposes unless the principal purpose of the allocation is the avoidance or evasion of income tax. See, e.g., *Orrisch v. Commissioner*, 55 T.C. 395, 399–401 (1970), affd. per curiam in an unpublished opinion (9th Cir. 1973, 31 AFTR2d 73–1069.) Although it has never been judicially resolved that allocations of bottom-line income are not subject to the tax-avoidance test of section 704(b), the reference of section 704(b) to "item," without a corresponding statutory provision disallowing any allocations of bottom-line gain or loss,[7] has caused some commentators to find a negative implication in the statute sanctioning allocation of bottom-line gain or loss with impunity. Other commentators have recognized the impact of the judicial doctrine of substance over form as adequate to deal with artificial attempts to allocate taxable income or losses. See, e.g., 1 A. Willis, Partnership Taxation, sec. 25.11, pp. 316–319 (1976). See also 1 W. McKee, W. Nelson & R. Whitmire, Federal Taxation of Partnerships and Partners, par. 10.01[2], p. 10–6 (1977); S. Kamin, "Partnership Income and Loss Allocations Before and After the Tax Reform Act of 1976," 30 Tax Law. 667 (1977).

The opportunity for the application of such a judicial gloss arose in *Kresser v. Commissioner*, 54 T.C. 1621 (1970), in which this Court was faced with a reallocation of bottom-line partnership taxable income that was without economic substance. In *Kresser*, the dominant partner in two partnerships had a large net operating loss carryover from sources outside the partner-

---

any item of income, gain, loss, deduction, or credit shall be determined in accordance with his distributive share of taxable income or loss of the partnership, as described in section 702(a)(9), for the taxable year, if—

(1) the partnership agreement does not provide as to the partner's distributive share of such item, or

(2) the principal purpose of any provision in the partnership agreement with respect to the partner's distributive share of such item is the avoidance or evasion of any tax imposed by this subtitle.

[7]Sec. 704 was amended by sec. 213(d), Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1597, to replace the tax-avoidance or evasion test with a substantial economic effect test and expressly to include bottom-line allocations within its purview. The Senate Finance Committee report indicates that the amendment was not intended to permit any inference to "be drawn as to the propriety or impropriety of a special allocation under present law." S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3), 49, 138–139.

ship that was about to expire. To permit him to take advantage of that carryover, all of the partnership income for the current year purportedly was allocated to him. In return it was understood that the other partners would not be disadvantaged thereby and that the dominant partner would restore to the other partners in subsequent years their shares of the partnership income that had been allocated to him.

In analyzing the tax effect of the purported allocation in *Kresser,* we stated that, "although the partners are to be permitted to readjust their distributive shares *inter sese,* such readjustments must be real, and we are therefore faced with the threshold issue as to whether there was any genuine readjustment of the partner's distributive shares." (54 T.C. at 1631.) In *Kresser,* we held that there was no bona fide reallocation since the purported reallocation of the entire partnership income for the taxable year to the dominant partner did not alter the partners' rights to their former distributive shares. The purported reallocation of income was "a paper transaction having no consequences of substance." (54 T.C. at 1632.) In short, for allocations of partnership bottom-line income or loss to be bona fide for Federal tax purposes, the allocations must accurately reflect the economic basis upon which the partners have agreed to share the profits and losses.

This test is an objective one. The failure of the transactions in *Kresser* to pass muster under the objective economic substance test made it unnecessary for us to consider whether the subjective "principal purpose of avoidance or evasion of tax" test under section 704(b)(2) applied only to "items" of income dealt with in section 702(a)(1) through (8) and not also, as respondent contended it did, to the composite of all income referred to in section 702(a)(9). (See 54 T.C. at 1631 n. 5.) In the instant case, respondent has abandoned his position that section 704(b)(2) applies to bottom-line loss allocations. Now, respondent is "in agreement with petitioners' argument that as a matter of statutory construction, code section 704(b)(2) has no application to allocations of taxable income or loss under code section 702(a)(9)." Respondent's reply brief page 38.[8]

---

[8]But see *Rodman v. Commissioner,* 542 F.2d 845, 856–859 (2d Cir. 1976) (Without addressing the item/bottom-line distinction, the Court stated that the retroactive allocation of taxable income to a new partner "falls within sec. 704(b)(2)'s caveat that a term in a partnership agreement cannot be controlling for tax purposes where its principal purpose is the evasion of taxes." 542 F.2d at 858);

To disallow the allocation of losses for tax purposes to petitioner here, respondent relies solely on the holding in *Kresser* to the effect that for allocations to be bona fide they must accurately reflect the basis on which the petitioner and Babcock agreed to share the economic profits and bear the economic losses of the joint venture.[9] We agree with respondent that *Kresser* provides an appropriate approach to judge petitioner's case. Under that standard, the purported allocation of losses to petitioner lacks economic substance.

Under the joint venture agreement, the purported allocation of all losses to petitioner for the years in issue in no way altered the economic return he would receive from the joint venture. Regardless of the amount of tax losses incurred, petitioner was entitled to share equally, with one minor exception, all economic proceeds generated by the joint venture. The only variation from an equal division was that, after the first $100,000 equity cash distribution was divided equally, Babcock Co. was entitled to the next $150,000. This variation was itself independent of the presence or extent of losses allocated to petitioner for Federal tax purposes. Proceeds of the joint venture were to be distributed irrespective of the amount or deficit in the respective capital accounts of the joint venturers. Under these circumstances, the special allocation to petitioner lacks economic substance and is therefore ineffective for Federal tax purposes.

As an alternative ground for the holding in *Kresser*, we found that the record failed to establish that there was compliance with the conditions of section 761(c) relating to modifications of partnership agreements. (54 T.C. at 1628–1630.) In petitioner's case, there is no issue whether compliance with section 761(c) was satisfied. Petitioner seizes upon this distinction to argue that *Kresser* is therefore inapplicable to the facts here. We disagree. In *Kresser*, the holding also clearly rested on the valid alternative ground that the purported allocation was not a bona fide readjustment of the partners' rights to economic gains and losses.

Moreover, under no stretch of the imagination does bona fide

---

*Sellers v. United States,* an unreported case (E.D. Va. 1978, 42 AFTR2d 78–5075, 78–1 USTC par. 9463; supplemental opinion 42 AFTR2d 78–6257, 78–2 USTC par. 9829) (The Court applied the test of sec. 704(b)(2) to bottom-line losses without discussion of the item/bottom-line distinction.)

[9]As support for this interpretation of *Kresser*, respondent relies on *Sellers v. Commissioner*, T.C. Memo. 1977–70, affd. on other issues 592 F.2d 227 (4th Cir. 1979).

allocation as used in *Kresser*, mean, as petitioner also argues, that the allocation for tax purposes merely must be that actually agreed to and carried out by the partners regardless of economic effect. Such a reading ignores the thrust of the holding in *Kresser*. It is immaterial that here, unlike in *Kresser*, petitioner made no agreement to restore to Babcock Co. the losses allocated to petitioner. *Kresser* dealt with allocations of income which, absent subsequent adjustments, apparently would have had economic effect. The promised subsequent readjustment negated an effective economic allocation, but it was not, as petitioner argues, the fact of readjustment per se that caused a finding that the allocation was not bona fide in *Kresser*. *Kresser* rested on the finding that in the final analysis the purported allocation in no way altered the partners' economic interests. Here, the absence of a subsequent adjustment to counter the purported allocation to petitioner does not negate the lack of economic substance to the initial allocation. There was no need for the parties to agree to a subsequent economic readjustment since the allocation had no economic effect initially. Moreover, Babcock Co.'s willingness, for whatever reasons, to give petitioner the benefit of all the tax losses without a subsequent readjustment for tax purposes cannot dictate tax results when such an allocation has no foundation in the actual basis upon which the parties agreed to share the economic gains and bear the economic losses of the joint venture.[10] This lack of economic substance necessitates a finding that here, as in *Kresser*, the purported allocation was not bona fide for Federal tax purposes.

Accordingly, we hold that petitioner is entitled to recognize only one-half of the losses of the Kings Creek Joint Venture for

---

[10]After the first 5 years, profits and losses as computed for tax purposes were to be reported equally without provision for a chargeback of income to petitioner to adjust for excess tax losses previously allocated to him. We express no opinion here as to what the result would have been if provision for a tax readjustment had been made or if any of the other factual variables were altered.

the years 1970 through 1973. To reflect concessions by the respondent and our conclusion on the disputed issue,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

TANNENWALD, *J.*, concurring in the result: Initially, I confess that I find myself on the horns of a dilemma due to two factors: (a) respondent's concession that the test of principal purpose of tax avoidance or evasion, contained in section 704(b)(2), does not apply, and (b) the fact that the ultimate decision herein is founded upon the evaluation of the record, including extensive oral testimony, by the trier of the facts, Judge Dawson.

As I view the majority opinion, it appears to me to articulate an inadequate standard for decision. In essence, the opinion seems to say that "economic substance" or "economic effect" is to be measured against an evaluation of whether the transaction involved herein is founded upon tax avoidance or evasion. To me, such a standard of measurement simply pushes section 704(b)(2) out the front door (because of respondent's concession) only to bring it back through the side door.

The application of the form-vs.-substance doctrine has usually occurred in the course of judicial determination of whether there was an economic basis for a particular transaction aside from the tax benefit. Or, to put it another way, the key element has been whether the transaction was constructed *entirely* for the tax advantage. *Knetsch v. United States*, 172 Ct. Cl. 378, 384–385, 348 F.2d 932, 936–937 (1965); *McLane v. Commissioner*, 46 T.C. 140, 145 (1966), affd. per curiam 377 F.2d 557 (9th Cir. 1967). See also *Owens v. Commissioner*, 64 T.C. 1, 14 (1975), affd. on the issue involved 568 F.2d 1233 (6th Cir. 1977); *Starr v. Commissioner*, 46 T.C. 450, 460 (1966). Admittedly, in applying that standard, the tax purpose underpinnings of a transaction have been an influencing factor. In the instant case, however, the presence of section 704(b)(2) and respondent's concession, in my opinion, severely limit, and, indeed, seem to eliminate, such a consideration. Given these circumstances, I believe that respondent can prevail only if the claimed lack of economic substance is

so pervasive that the arrangement in question should properly be characterized as "sham."

I do not believe that the majority opinion has observed the line between purpose of avoidance or evasion of tax (the legislative test embodied in section 704(b)(2), which, by hypothesis, does not apply herein) and the proper application *to this case* of the form-vs.-substance doctrine, which I am prepared to concede provides an overall judicial gloss to the Internal Revenue Code.[1] On the contrary, the majority opinion seems to do no more than say that the divergence between the allocation of "bottom-line" profits and losses[2] and the actual division of funds during the taxable years in question is, in and of itself, sufficient to sustain respondent's position. But, as I have already stated, this appears simply to make the test of "economic substance" or "economic effect" the same as that embodied in section 704(b)(2). If such were the case, the extensive discussions by the commentators as to whether section 704(b)(2), in its original form, applied to "bottom-line" allocations and the enactment of the amendment of that section by section 213(d) of the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1548, were exercises in futility.

The mere application of an improper standard does not, however, afford me a sufficient basis for necessarily disagreeing with the result reached herein. See my dissenting opinion in *Estate of Gilman v. Commissioner*, 65 T.C. 296, 323 (1975).[3] Granted that, if I had been the trier of the facts, I might have reached the opposite result, I think it would be inappropriate for me to assume that Judge Dawson would have so concluded had he applied the standard I espouse.

In short, I return to my dilemma and conclude that, although I disagree with the standard which the majority appears to have adopted, I do not believe it lies within my province to make an independent evaluation of the record and perhaps reach a contrary result. Hence my concurrence.

---

[1]Whatever may be the "thrust" of *Kresser v. Commissioner*, 54 T.C. 1621 (1970), the fact is that the record in that case was obscure in many respects and, as a consequence, I do not think it controls our decision herein.

[2]The Apr. 15, 1971, amendment to the agreement provided that profits would also be allocated to petitioner, retroactive to Jan. 1, 1970, but it seems clear that the partners were certain that there would be no profits at least through 1975.

[3]The Court's decision was affirmed per curiam, 547 F.2d 33 (2d Cir. 1976).

SIMPSON, *J.,* concurring: I agree with the conclusion of the majority, but I have somewhat different reasons for reaching that conclusion.

As I understand the provisions of section 704 as they were enacted in 1954, it was contemplated that partners were to have broad authority in allocating the consequences of a partnership enterprise; the only limitation was that if the principal purpose of the allocation was tax evasion or avoidance, the allocation would not be recognized for tax purposes, and that limitation was set forth in section 704(b)(2). See S. Rept. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. 379 (1954); *Rodman v. Commissioner,* 542 F.2d 845, 857–858 (2d Cir. 1976); *Smith v. Commissioner,* 331 F.2d 298 (7th Cir. 1964), affg. a Memorandum Opinion of this Court; *Moore v. Commissioner,* 70 T.C. 1024, 1033 (1978); *Harris v. Commissioner,* 61 T.C. 770, 785 (1974); *Orrisch v. Commissioner,* 55 T.C. 395, 400–401 (1970), affd. per curiam in an unpublished opinion (9th Cir. 1973). Therefore, if the slate were clean, I would have held that section 704(b)(2) is the only applicable limitation in this case. Although there is a question as to whether section 704(b)(2) was intended to apply to the "bottom-line" allocations, I would have held that despite the use of the word "item," an examination of subchapter K and its legislative history indicates that section 704(b)(2) should be applied to all allocations. Yet, since the Commissioner has conceded that section 704(b)(2) does not apply in this case, the result would have been to decide the case in favor of the petitioners.

In fact, the slate is not clean, and in my opinion, *Kresser v. Commissioner,* 54 T.C. 1621 (1970), has established a precedent for holding that there is another limitation on a partnership's authority to allocate tax consequences. In effect, it holds that when the allocation is made for tax purposes and lacks economic reality, the allocation is not to be recognized. Despite my own views of section 704, I recognize that there is a question as to the scope of section 704(b)(2), and therefore, I am not prepared to argue that *Kresser* should not be followed. Accordingly, I reach the conclusion that it constitutes precedent for the holding in this case.

In my view, there is some question as to what were the real terms of the bargain between the partners in this case. Nevertheless, Judge Dawson heard the case, and he has conclud-

ed that the petitioners have failed to prove that the allocation did have economic reality; I accept his conclusion on this matter.

In 1976, Congress amended section 704(b) to make clear that it applies to the allocation of bottom-line income and losses and to provide that any such allocation is ineffective if it "does not have substantial economic effect." For years subject to the 1976 amendment, a question might arise as to whether the "judicial gloss" enunciated and applied by Judge Dawson is in addition to and different from the "substantial economic effect" standard now set forth in section 704(b)(2). Such issue is not presented by this case, and the Court's opinion should not be understood as taking a position on it.

FAY, *J.*, dissenting: I respectfully dissent.

As its reason for failing to give recognition to the allocation herein, the majority has concluded such allocation lacked "economic substance." This conclusion was grounded on the fact that the proceeds of the joint venture, with "one minor exception" totaling $150,000, were to be shared equally between petitioner and his coventurer. By focusing its attention on the ultimate distribution of the proceeds from the venture, the majority has essentially applied the "substantial economic effect" test embodied in the regulations under section 704(b)(2). *Orrisch v. Commissioner*, 55 T.C. 395 (1970), affd. per curiam in an unpublished opinion (9th Cir. 1973); sec. 1.704–1(b)(2), Income Tax Regs. In view of respondent's concession that section 704(b)(2) has no application to bottom-line allocations, I agree with Judge Tannenwald and believe the majority has used the improper standard to serve as the basis for its decision. Specifically, I think the relevant inquiry in this case should be whether the allocation served any bona fide business purpose apart from the resultant savings in taxes. To be sure, the end result of the allocation of the losses to petitioner was intended to reduce his taxes, however, I submit that if such allocation was negotiated at arm's-length, and agreed upon for the purpose of compensating petitioner for his knowledge and experience in obtaining the financing for the joint venture, it should be respected. In this connection, I recognize the facts as set forth in

the majority's opinion do not expressly state the purpose for making the special allocation of losses to petitioner,[1] nevertheless, I do think they are sufficient to support the conclusion that the allocation was intended to compensate petitioner for the risks he agreed to undertake.

To begin with, it is clear that Babcock was in need of someone with petitioner's expertise to successfully carry out the construction of the Kings Creek Apartments. It is also apparent that Babcock used the tax advantage of the losses in the project's early years as an inducement to petitioner for his joining the venture. The mere fact that the inducement was in the form of reduced taxes, in my opinion, does not alter the conclusion that it served a valid business purpose. That being the case, I would honor the allocation. See *Lyon Co. v. United States*, 435 U.S. 561, 580 (1978); *Van Raden v. Commissioner*, 71 T.C. 1083 (1979).

The majority, as support for its use of the economic effect test, relies heavily on *Kresser v. Commissioner*, 54 T.C. 1621 (1970). I submit this reliance is misplaced. In that case, to take full advantage of an expiring net operating loss carryover, the partners of two partnerships agreed to allocate all the income from both partnerships for 1 year to a single partner. It was also agreed in later years the income so allocated would be fully restored to the other partners. In refusing to give effect to the purported reallocation, we in essence found the reallocation to be nothing more than a sham. In other words, the only apparent motivation for the reallocation was to secure a savings in taxes, and, unlike the present case, it appeared to serve no other purpose or have any other significant effect. For this reason, I believe the case to be clearly distinguishable.

---

[1]Sec. IV(A) of the joint venture agreement as set forth in the findings of fact states that the losses were to be allocated to petitioner because the adjusted basis of the property contributed by Babcock to the joint venture "differs substantially from the fair market value of said property at the time of its contribution." This statement, however, was stricken when the agreement was subsequently amended on Apr. 15, 1971.