WILLIAM YOUNG and RUBY YOUNG, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Young v. Commissioner
Docket No. 12488-80.
United States Tax Court
T.C. Memo 1987-397; 1987 Tax Ct. Memo LEXIS 394; 54 T.C.M. (CCH) 119; T.C.M. (RIA) 87397; August 11, 1987. Ted R. Frame, Edward B. Simpson, and John Gigounas, for the petitioners. William H. Quealy, Jr., for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined the following deficiencies in petitioners' Federal income tax liability: Year
Deficiency
1972
$  37,629.70
1974
110,016.66
1975
131,922.90
1976
12,081.50
*395 In an Amendment to Answer, respondent asserts an increased 1976 deficiency in the amount of $ 85,299.50. After concessions, the sole issue for decision is whether a limited partnership's allocation of its 1975 "bottom line" tax loss had economic substance. [1]
FINDINGS OF FACT Many of the facts have been stipulated, and the facts set forth in the stipulation are incorporated in our findings by this reference. William Young (petitioner) and Ruby Young resided in Bakersfield, California, when their petition was filed. Petitioner was a limited partner in Spokane Hotel Associates (Spokane), which was in turn a limited partner in Riverfront Associates (Riverfront). Riverfront was organized to design, construct, and operate a Sheraton hotel near the site of Expo '74 in Spokane, Washington. Riverfront succeeded to a joint venture conducted by U.S. Development Co., Inc. (USDC), and J & B Investments, Inc., (J & B). On December 28, 1973, USDC, J & B, and a number of USDC's shareholders *396 formed Riverfront. USDC, J & B, and a USDC shareholder named Martin Sandler (Sandler) were Riverfront's general partners; the remaining USDC shareholders were Riverfront's original limited partners. USDC contributed to Riverfront its interest in a feasibility study, the designs, plans, and specifications for the hotel and its interest in the limited assets of the joint venture. J & B contributed to Riverfront its interest in the assets of the joint venture and $ 5,000. Sandler and the remaining USDC shareholders agreed to become personally liable for loans that had been advanced to the joint venture. The joint venture had been heavily leveraged. Its principal assets were its Sheraton franchise and its long-term lease of the hotel site. The lease permitted assignment of the joint venture's leasehold as collateral for construction loans. On November 7, 1973, the joint venture obtained an $ 8 million loan commitment from Guardian Mortgage Investors (GMI). The limited partnership obtained additional debt financing. Most of the project's managers, architects, and contractors were USDC shareholders and limited or general partners in Riverfront. The partnership deferred payment *397 of its partners' professional fees and recorded such fees as debt. The partnership also obtained a number of other loans, including one loan of almost $ 1 million from a commercial bank. Construction of the hotel began in February 1974. By mid-year, after several revisions of the hotel's design, Sandler realized that the limited partnership needed additional capital. In late April or early May, he placed an advertisement in the "Capital Wanted" section of the Wall Street Journal announcing the availability of additional Riverfront limited partnership interests. Orell Clem (Clem) and S. Robert Smith (Smith) responded to the advertisement. Clem and Smith were sole shareholders of Domus Financial Services, Inc. (Domus). Domus sold real estate investments to wealthy clients. In August 1974, Clem and Smith formed Spokane for the principal purpose of acquiring a Riverfront limited partnership interest. Domus was Spokane's sole general partner. Clem and Smith sold limited partnership interests in Spokane to Domus clients seeking tax-advantaged investments. On December 31, 1974, Spokane contributed $ 500,000 to the project and became a limited partner pursuant to Riverfront's *398 amended Articles of Limited Partnership. The amended Articles allocated 75 percent of Riverfront's 1974 and 1975 tax profits or losses to Spokane, but provided that the new limited partner was to be allocated only 10 percent of the partnership's tax profits or losses in all subsequent years. Prior to any distribution of Riverfront's net cash flow, Spokane was to receive 25 percent of the partnership's operating profits as a partial return of its capital contribution. Until its capital contribution was repaid, Spokane was also entitled to receive 100 percent of all proceeds from the sale or refinancing of the partnership's property. Net cash flow remaining after return of Spokane's capital was to be distributed in the proportions provided for allocation of tax profits or losses. On dissolution of the partnership, Spokane was entitled to a return of its capital contribution prior to any distribution of assets to the remaining partners. After return of its capital, Spokane would receive 10 percent of any remaining partnership assets. The Articles did not require any of the partners to make up deficit balances in their respective capital accounts. Apart from the written partnership *399 agreement, there were no other oral or written agreements between Riverfront and Spokane regarding the allocation of profits and losses, distributions, or contributions of capital. The following amounts of ordinary loss were reportable by Riverfront: Year
Losses
1973
$ (  120,900)
1974
(  501,505)
1975
(1,356,495)
1976
(1,224,397)
On its returns for the years indicated, Spokane reported its share of Riverfront's losses as follows: 1974
1975
1976
$ (586,882)
$ (1,122,371)
$ (107,512)
Riverfront maintained capital accounts for its partners. Riverfront's gross capital accounts for 1974 and 1975 were shown on its partnership returns as follows: Year
Opening Balance
Contributions
Distributions
End Balance
1974
$ (171,569)
$ 500,000
$ (  782,508)
$ (  454,077)
1975
(454,077)
90,000
(1,496,494)
(1,860,571)
The following summarizes the entries and balances in the account for Spokane: Year
Opening Balance
Contributions
Distributions
End Balance
1974
--
$ 500,000
$ (  586,882)
$ (   86,882)
1975
$ (86,882)
--
(1,122,371)
(1,209,253)
*400 On their joint income tax returns for the years 1974, 1975, and 1976, petitioners reported losses of $ 190,407, $ 246,922, and $ 23,653, respectively, as petitioner William Young's distribute share of Spokane's losses. In a notice of deficiency, respondent disallowed each of these losses because the creation and operation of Spokane was allegedly a sham transaction without economic substance. In the alternative, respondent determined that Spokane was entitled to report only 10 percent of Riverfront's losses. [2] The parties have agreed that petitioners are entitled to no part of Riverfront's 1974 tax loss. OPINION Riverfront allocated 75 percent of its so-called "bottom line" tax loss to petitioner's limited partnership. Ordinarily, a partnership *401 agreement as to allocation of income, gain, loss, deduction, or credit will be respected for tax purposes. Section 704(a). [3] Effect is given to the allocation, however, only if it accurately reflects the basis on which the partners have agreed to share economic profit and loss. Goldfine v. Commissioner,80 T.C. 843, 850 (1983); Boynton v. Commissioner,72 T.C. 1147, 1159 (1979), affd. 649 F.2d 1168 (5th Cir. 1981); Holladay v. Commissioner,72 T.C. 571, 587 (1979), affd. 649 F.2d 1176 (5th Cir. 1981); Kresser v. Commissioner,54 T.C. 1621 (1970). This overriding principle is sometimes referred to as a test of "economic substance." Boynton v. Commissioner,72 T.C. at 1159. [4]
*402 Riverfront's purported allocation of bottom line tax loss to Spokane lacked such "economic substance." The terms of Riverfront's partnership agreement compel this conclusion. The provisions of that agreement maximized Spokane's tax loss while minimizing its exposure to actual economic loss. Although Riverfront's allocation of tax loss to Spokane caused the new limited partner's capital account to become disproportionately negative, provisions of the partnership agreement operated independently of the partners' capital accounts to assure Spokane of a partial return of its capital prior to any interim distribution and a full return of its capital prior to any distribution of assets in dissolution. Moreover, the allocation of tax loss did not in any way affect Spokane's right to receive 10 percent of all distributions of assets remaining after return of its capital. Riverfront's allocation of tax loss to Spokane thus did nothing more than protect Spokane's investors from economic loss in the initial years of the project. As contemplated by the deal that they had arranged, if Riverfront had collapsed without assets sufficient to refund Spokane's capital contribution, Spokane would *403 have been under no obligation to make up the deficit balance in its capital account and its investors would have recouped most of their investment through tax savings. The testimony of Orell Clem confirms our construction of Riverfront's partnership agreement: We were going to receive 75 percent of the profits and losses for 1974 and '75 and we were going to have a ten percent equity position. In terms of cash flow, * * * [we would receive] a preferential 25 percent return, and then an additional ten percent return until such time as the $ 500,000.00 investment was fully recovered, at which point, it would revert to simply a ten percent return. And the reason why we did that, from our end of it was that in 1974 and '75, I was extremely concerned about investing on behalf of the partnership, $ 500,000.00 * * * * * * if something happened and the whole deal went down the tubes in 1974 or '75, I wanted to be sure that, myself included, since I invested too, I didn't want to lose all my money and give it all to the Riverfront partners. I mean, they might have been nice people, but my understanding at the time, was that if I only had a 10 percent equity and I didn't have a *404 disproportionate interest, if the thing went down the tubes, we would put up all the money and not gotten our losses. It would have been a disaster. [Emphasis supplied.]
In short, a disproportionate allocation of tax benefits was intended to insulate Spokane from the economic consequences of its 10 percent equity position. Petitioner's reliance on Dibble v. Commissioner,T.C. Memo. 1984-589, is therefore misplaced. In Dibble, we respected a partnership agreement's allocation of losses because liquidating distributions were to be made in accordance with the partners' capital account balances and because each of the partners maintained a positive capital account. We concluded that because the taxpayers maintained positive capital account balances, no partner would bear more than his share of the economic cost of the allocation. Petitioner maintains that the negative balance of Spokane's capital account would be eliminated if Riverfront's partners' accounts were "marked to market" to reflect purported appreciation of the partnership's assets. This argument is unsupported by any evidence of fair market value, [5] is contrary to the principles of *405 taxation that refuse to give effect to unrealized appreciation or loss, and is specious in view of Riverfront's partnership agreement. Any distribution of Riverfront's assets was to be made after return of Spokane's capital contribution and without regard to the partners' capital accounts. Were Riverfront to dissolve during the year in issue, or at any time before repayment of Spokane's capital contribution, Spokane's Riverfront partners would bear more than their specified 90 percent share of the partnership's economic loss. Were the property to be sold at its alleged appreciated value, proceeds would be paid first to Spokane -- thereby eliminating any loss previously recorded in its capital account by reason of the 75 percent allocation. In short, were Spokane's capital account "marked to market," the allocation provisions of Riverfront's partnership agreement would nevertheless be devoid of economic substance. Petitioner's "business purpose" argument is also without merit. Petitioner contends that Riverfront's allocation of tax loss to Spokane was *406 an essential element of Sandler's attempt to raise additional capital for the hotel project. The sale of tax benefits for needed capital does not embue an otherwise invalid allocation with "economic substance." See Allison v. United States,701 F.2d 933, 937-938 (Fed. Cir. 1983); Goldfine v. Commissioner,80 T.C. at 854; Orrisch v. Commissioner,55 T.C. 395, 401 (1970), affd. per curiam in an unreported opinion (9th Cir. 1973, 31 AFTR2d 73-1069). Section 704(a) simply does not permit one partner to purchase another partner's distributive share of loss. Where a partnership agreement's allocation provisions fail, we determine the basis on which the partners agreed to share economic profits or losses and allocate the tax profits or losses accordingly. Orrisch v. Commissioner,55 T.C. at 402. If other provisions of the partnership agreement effectively specify how the profits are to be divided and how the losses are to be borne, the distributive shares of the partners will be determined in accordance with *407 such provisions. Boynton v. Commissioner,72 T.C. at 1158. Petitioner has not established that Spokane bore more than 10 percent of Riverfront's economic loss in 1975. Rule 142(a), Tax Court Rules of Practice and Procedure; Rockwell v. Commissioner,512 F.2d 882 (9th Cir. 1975), affg. a Memorandum Opinion of this Court. We consequently hold that Spokane's distributive share of Riverfront's tax loss was 10 percent as set forth in respondent's notice of deficiency. To reflect the concessions of the parties, Decision will be entered under Rule 155.
Footnotes
1. The parties in Morse v. Commissioner, docket Nos. 9796-79 and 11685-80, and Basso v. Commissioner,↩ docket No. 6697-82, have agreed to be bound by our resolution of this issue. 2. On brief, respondent apparently abandoned the primary basis for his determination and affirmatively asserted that Spokane was entitled to report no more than 2.5 percent of Riverfront's losses. We decline to consider this argument raised for the first time after trial. Leahy v. Commissioner,87 T.C. 56, 64-65↩ (1986). 3. Unless otherwise indicated, all section references are to the Inernal Revenue Code of 1954, as amended and in effect during the years in issue. As in effect in 1975, Section 704(b)(2) states that a partnership agreement as to allocation of a tax "item" will be disregarded if the principal purpose of the allocation is the avoidance or evasion of income tax. Prior to the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, there was some question as to whether section 704(b)(2) limited an allocation of so-called "bottom line" taxable income or loss. See generally Holladay v. Commissioner,72 T.C. 571, 586-687 (1979), affd. 649 F.2d 1176 (5th Cir. 1981); Kresser v. Commissioner,54 T.C. 1621, 1631, n.5 (1970). For the purposes of this case, respondent concedes that section 704(b)(2)↩ does not apply to Riverfront's allocation of its 1975 "bottom line" tax loss. 4. The Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, amended the Code to provide that allocations of "bottom line" profit or loss are subject to the limitations set forth in section 704(b). The Act also replaced the tax avoidance or evasion test of former section 704(b)(2) with a test of "substantial economic effect." We have adopted a capital accounts analysis of "substantial economic effect." See Ogden v. Commissioner,84 T.C. 871, 883-884 (1985), affd. per curiam 788 F.2d 252 (5th Cir. 1986). See also Elrod v. Commissioner,87 T.C. 1046, 1082-1086 (1986); Gershkowitz v. Commissioner,88 T.C. 984, 1017-1019 (1987). Although we consider Spokane's capital account, we do not decide whether the test of "economic substance" developed under section 704(a) is equivalent to the test of "substantial economic effect" now set forth in section 704(b)(2)↩. 5. Petitioners propose a finding of value based on a hearsay appraisal specifically rejected during trial as proof of value. ↩