ARTHUR E. AND SELMA LONG, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

DAVE AND BERNETTE N. CENTER, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 17522–79, 17528–79.    Filed October 29, 1981.

---

*William E. Frantz,* for the petitioners.
*Lourdes M. DeSantis,* for the respondent.

SCOTT, Judge: Respondent determined deficiencies of $91,323 and $10,658 for the calendar years 1975 and 1976, respectively, in the Federal income tax of Arthur and Selma Long and deficiencies in the amount of $153,443 and $4,761 for the calendar years 1975 and 1976, respectively, in the Federal income tax of Dave and Bernette Center.

After concessions by the parties, the issues for decision are: (1) Whether the exchange of an interest in a Texas general partnership for an interest in a Georgia joint venture qualifies for nonrecognition treatment under section 1031(a), I.R.C. 1954;[1] (2) if the exchange does fall within section 1031(a), whether gain should be recognized to the extent of the nonqualifying property received in the exchange as provided in section 1031(b); (3) if gain is recognized, whether the basis of the property received should be increased by the full amount of the gain recognized pursuant to section 1031(d); and (4) whether petitioners are liable for the minimum tax imposed on tax preference items for the taxable year 1975 under section 56(a) and whether they are entitled to income averaging for the taxable year 1976.

---

[1]Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect in the years in issue.

Some of the facts have been stipulated and are found accordingly.

Arthur and Selma Long (husband and wife) and Dave and Bernette Center (husband and wife) were residents of the State of Georgia at the time of the filing of their petitions in this case. Each of these couples filed joint Federal income tax returns for the calendar years 1975 and 1976 with the Internal Revenue Service Center in Chamblee, Ga.

Arthur Long and Dave Center (petitioners) were successful executives employed in Atlanta, Ga., during the years relevant to this case. Each petitioner kept his books and records on the cash basis for the years here in issue.

During the years 1974 and 1975, petitioners were members of a Texas partnership, known as Lincoln Property Co. No. Five of Atlanta, Ga. (Lincoln Property), which owned property in the Atlanta, Ga., area. The principal place of business of Lincoln Property was located in Atlanta, Ga. The partnership kept its books and records and filed its income tax returns on the cash basis method of accounting, using a calendar year. It filed its Forms 1065, U.S. Partnership Return of Income, for the calendar years 1974 and 1975 with the Internal Revenue Service Center, Chamblee, Ga.

During the years 1974, 1975, and 1976, petitioners were members of a Georgia joint venture, known as Venture Twenty-One, which owned property in Atlanta, Ga. The principal place of business of the joint venture was located in Atlanta, Ga. The joint venture kept its books and records and filed its income tax returns on the cash basis method of accounting, using a calendar year. It filed its Forms 1065 for the calendar years 1974, 1975, and 1976 with the Internal Revenue Service Center, Chamblee, Ga.

## I. Lincoln Property Partnership

The Lincoln Property partnership was a general partnership formed on September 30, 1965, by the Robert T. Crow Trust (Trammell Crow, trustee), Ewell G. Pope, and Frank C. Carter for the purpose of engaging in the business of acquiring and holding for investment real property located in the cities of East Point and Atlanta, Ga. In early 1966, the partners began making plans to develop the property owned by the partnership and on January 10, 1966, the Citizens & Southern

National Bank (Citizens & Southern) agreed to lend the partners $232,000 in proportion to their interests in the Lincoln Property partnership. On August 12, 1966, Citizens & Southern, on the basis of an application filed by the parties, approved a construction and mortgage loan in the amount of $1,500,000 to Lincoln Property. The proceeds of the loan were to be used in the construction of the Franciscan Apartments which consisted of a 160-unit garden apartment complex comprised of two-story buildings plus a separate clubhouse. Trammell Crow guaranteed the payment of that portion of the loan outstanding in excess of $1,200,000.

On August 18, 1966, the partners, Trammell Crow, trustee, Pope, and Carter entered into a construction loan agreement with Citizens & Southern for the financing of the construction of the Franciscan Apartments complex. This agreement provided, among other things, that permanent financing would be obtained from Teachers Insurance & Annuity Association of America (Teachers Insurance) upon completion of the apartments.

After additional financing from Teachers Insurance had been arranged and all rights had been transferred to Teachers Insurance from Citizens & Southern, the partners, on November 1, 1967, agreed with Teachers Insurance to consolidate the deeds and the notes outstanding on the Franciscan Apartments into a consolidated loan in the amount of $1,875,000 to be held by Teachers Insurance. The document executed, entitled "First Supplement to Security Deed," stated that an additional parcel of land was conveyed to Teachers Insurance as security for the debt, and certain terms and conditions of the mortgage were amended. In paragraph 6, the agreement stated that notwithstanding any prior provision to the contrary, in the event that Teachers Insurance should take action to collect the indebtedness due, it was to first foreclose on the secured property. If that was insufficient to pay the indebtedness, Trammell Crow was personally liable only to the extent that the foreclosure price plus the balance of the debt exceeded $1,500,000. Otherwise, there was no personal liability on the part of Crow, Pope, or Carter.

On December 18, 1967, Citizens & Southern approved a construction loan in the amount of $1,275,000 to Trammell Crow, trustee, Pope, and Carter for the purpose of constructing

phase III of the Franciscan Apartments. Under the terms of the agreement, Teachers Insurance was to accept the responsibility for the permanent financing upon the completion of phase III of the apartments. As of December 18, 1967, phases I and II of the Franciscan Apartments consisted of 200 completed apartments. As of January 15, 1968, the principal amount of the mortgage held by Teachers Insurance on the Franciscan Apartments was $3,150,000.

During early 1968, petitioners were looking for investment opportunities and the Lincoln Property partnership was brought to their attention by Herb Dickson, who at that time was executive vice president of Citizens & Southern. The apartment complex appeared to petitioners to be an excellent investment because the apartments had a waiting list of over a year in length and the Lincoln Property partners represented that they would guarantee petitioners a stated cash flow each year.

On or about April 5, 1968, petitioners invested $275,000 each in the Lincoln Property partnership. On April 5, 1968, they executed an Amended Partnership Agreement of Lincoln Property along with Crow, Pope, and Carter. The amended partnership agreement (agreement) provided that after the combined contribution of $550,000 of Long and Center, the capital account of each partner would be as follows: Crow, $550,000; Pope, $275,000; Carter, $275,000; Long, $275,000; and Center, $275,000. The agreement also stated that—

The parties agree that the combined capital accounts of partners Crow, Pope, and Carter will be equal to the total of the combined accounts of partners Long and Center by January 1, 1970. If this equalization has not taken place on or before December 31, 1969, on January 1, 1970 such equalization shall be deemed to have taken place.

The agreement provided that partners Long and Center were to each receive a minimum guaranteed payment of $27,500 per year from June 1, 1968, to March 1, 1974, and $13,750 from June 1, 1974, to March 1, 1983. Similar guaranteed payments were to be made to Crow, Pope, and Carter. After January 1, 1970, all cash flow in excess of the guaranteed payments and all profits and losses of the partnership were to be distributed to the partners in proportion to their partnership interests which were as follows: Crow, 25 percent; Pope, 12.5 percent; Carter, 12.5 percent; Long, 25 percent; and

Center, 25 percent. Partners Crow, Pope, and Carter also jointly and severally agreed that if there were insufficient cash flow in any year, to pay the full guaranteed payments to partners Long and Center, they would contribute sufficient funds to the partnership to enable the payments to be made, with Crow, Pope, and Carter contributing 50 percent, 25 percent, and 25 percent, respectively. The agreement stated that "Such contributions shall increase the respective capital accounts of such partners, but shall not alter the partner's interests in profits and losses of the partnership." For tax purposes, the partnership deductions resulting from the guaranteed payments to partners Long and Center were to be shared by Crow, Pope, and Carter in the same proportions as their above-stated contributions, and the deductions resulting from the guaranteed payments to partners Crow, Pope, and Carter were to be shared equally by partners Long and Center.

The partners agreed that the total cost of completing the Franciscan Apartments was not to exceed $4,250,000. In addition, partners Long and Center could not be required to contribute capital for the completion of the apartments in excess of their total initial contribution of $550,000.

Other provisions in the agreement included the right of partners Long and Center to designate the method of depreciation to be used by the partnership; that all partners agree that the partnership will continue until June 1, 1988, or until the partnership is dissolved by the unanimous approval of all of the partners; and the restriction of an assignment of an interest in the partnership without a written offer having first been made to the partnership and to the partners which offer shall last 60 days after the receipt of the offer by the partnership. The agreement stated that it was to be governed by the laws of the State of Texas and "Except to the extent the Texas Uniform Partnership Act is inconsistent with the provisions of this Partnership agreement, the provisions of such Act shall apply to the Partnership created thereby."

The agreement provided that the partnership property was to be held for investment and that the property was not to be sold or transferred for 5 years. After 5 years, the property could be sold and Long and Center were guaranteed a return of $550,000 plus 12-percent interest on their average capital account less all payments made to them by the partnership.

If the partnership was terminated, the agreement provided that the partnership shall be dissolved and the partnership business wound up and all of its properties distributed in liquidation as soon as possible. The proceeds from the liquidation of the partnership were to be applied in order of priority as follows:

1. Debts of the Partnership, other than to partners; provided, however, that in the case of debt secured by property of the Partnership, undivided interests in such property in the proportions of the partners' interest in the profits or losses shall be distributed in kind to the partners and each of such partners shall be severally liable (as among each other) for his proportionate part of said debt which need not be paid or otherwise discharged out of the proceeds of liquidation.

2. Debts of the Partnership·owed to partners.

3. The capital contributions of the partners as reflected in their respective Capital Accounts on a pro rata basis.

Any gain or loss on disposition of the Partnership assets in the process of liquidation shall be credited or charged to the respective partners in the proportion of their interests. Should any partner have a debit balance in his Capital Account, whether by reason of losses in liquidating Partnership assets or otherwise, said debit balance shall represent an obligation from him to the other partners.

On July 18, 1969, petitioners executed a power of attorney in favor of Crow, Pope, and Carter, so that they could then convey full fee simple title in the Franciscan Apartments to Teachers Insurance. On July 18, 1969, Crow, Pope, and Carter, and Teachers Insurance entered into an agreement entitled "Second Supplement to Security Deed." This agreement recited that Crow, Pope, and Carter had executed a third security deed note in the amount of $1,328,835.86 payable to Teachers Insurance and that the parties now wanted to consolidate the terms of the total debt of $3,150,000 and expand the coverage of the lien on the apartments so that it applied to the total indebtedness. Paragraph 6 of the first supplement to security deed was deleted. In its place, the parties agreed that in the event of default, Teachers Insurance was to foreclose first on the secured property but if the proceeds were insufficient to satisfy the outstanding indebtedness, then Crow, Pope, and Carter were not personally liable. However, the provision did state that the agreements therein were not to affect or impair the liens on the property or the warranty of title made by the grantors "nor shall anything in this paragraph contained affect or impair any Guaranty relating to this indebtedness

made for the benefit of the Grantee." Finally, on that same date, July 18, 1969, Crow, Pope, and Carter executed an agreement entitled "Security Deed Note No. 3." The agreement stated that Crow, Pope, and Carter jointly and severally promised to pay Teachers Insurance $1,328,835.86, with interest payments only on a monthly basis for the balance of 1969 and thereafter, monthly payments of principal and interest of $9,694.48 with complete repayment due August 1, 1993. The note was secured by a first security deed to the Franciscan Apartment complex. The balance due on this note as of May 9, 1975, was $1,191,458.21. In a document entitled "Third Supplement to Security Deed and First Supplement to Assignment of Leases and Rents" dated June 2, 1970, which was intended only to modify and not to replace the security deed as previously amended, petitioners Center and Long conveyed all their right, title, and interest in the Franciscan Apartments to Teachers Insurance. The agreement stated that—

Long and Center shall not be personally liable on account of or pursuant to any event of default committed by Crow, Pope and Carter or any other person liable under any evidence of said consolidated indebtedness or any part thereof secured by the Amended Security Deed or other related loan documents.

On February 19, 1973, the partners, Crow, Pope, Carter, and petitioners Long and Center executed an amendment to the partnership amendment of Lincoln Property Co. The purpose of this amendment was to provide a moratorium on the guaranteed payments due partners Long and Center under the partnership agreement dated April 5, 1968. Partners Crow, Pope, and Carter asked for the moratorium because the partnership was having difficulty renting the apartments and the cash operating expenditures were exceeding the income produced from the Franciscan Apartments properties. The amendment stated that the intent of the parties was—

solely to provide for a "moratorium" on the guaranteed payments to all partners for the payments due March 1, 1973 and June 1, 1973 and the quarters relating thereto, and to provide for the payment of said guaranteed payments at a later date without any reduction in the total amount of payments or any impairment of the obligation of partners CROW, POPE and CARTER to contribute funds needed to make such payments and this amendment shall be construed in conformity with such intent.

On March 31, 1975, all of the partners of Lincoln Property

executed an agreement entitled "Amendment to Partnership Agreement of Lincoln Property Company No. Five of Atlanta, Georgia." The purpose of the amendment was to relieve Crow, Pope, and Carter from the obligation of guaranteeing the funds for the guaranteed payments to Long and Center, and, in return, Long and Center's share of the liabilities was to be reduced. Accordingly, the guaranteed payment provision was eliminated.

The partnership agreement dated April 5, 1968, provided that the cash flow, after the guaranteed payments, and all profits and losses of the partnership were to be distributed to the partners in proportion to their partnership interests. However, the amendment dated March 31, 1975, separated the treatment of the distribution of profits from the distribution of losses. It provided that after January 1, 1970, all cash flow after guaranteed payments and all profits in the partnership were to be distributed according to the partners' interests in the partnership which were as follows: Crow, 25 percent; Pope, 12.5 percent; Carter, 12.5 percent; Long, 25 percent; and Center, 25 percent.

The losses of the partnership incurred after December 31, 1974, were not to be distributed to the partners in proportion to their interests in the partnership, but rather were to be distributed to the partners in proportion to their respective share of partnership liabilities. In this regard, the partnership liabilities were reallocated as follows:

Partnership liabilities equal to the greater of $750,000 or 50% of the partnership's excess indebtedness shall be allocated to partners Center and Long. The excess indebtedness of the partnership for any fiscal year shall be determined by subtracting the amount of mortgage indebtedness on partnership real property ("Mortgage Indebtedness") as of the end of the last fiscal year from the product obtained by multiplying the "cash flow" of the partnership for its last fiscal year by 10. Partners Crow, Pope and Carter shall be allocated all partnership liabilities less partnership liabilities hereinabove allocated to Center and Long. For the purposes of this subparagraph only, "cash flow" of the partnership shall mean cash revenues received by the partnership less cash disbursements for interest expense on Mortgage Indebtedness.

At the conclusion of the amendment, the partners stated that—

All other terms, conditions and provisions set forth in the Partnership Agreement shall remain in full force and effect and shall not be amended or

modified except as specifically set forth herein. The partners hereby reaffirm and agree to be bound by all of the terms and conditions of the Partnership Agreement.

## II. Joint Venture Twenty-One

On June 30, 1969, Robert Crow, Pope, Carter, and A. J. Land executed a partnership agreement establishing a partnership known as Crow, Pope & Carter Property Company No. 21 of Atlanta, A. (CPC). The partnership agreement stated that the partnership was to engage in the business of acquiring and operating for profit an apartment development called the Lindbergh Apartments located in Atlanta, Ga. At the time they formed CPC, they established it with a view to holding title to the Lindbergh Apartments in a joint venture, which joint venture was to be entered into with petitioners Long and Center.

Petitioners Long and Center entered into a joint venture with CPC on October 1, 1969. The joint venture, known as Venture Twenty-One (hereinafter sometimes referred to as joint venture), was formed for the purpose of owning and operating the Lindbergh Apartments. The agreement provided that Long and Center would contribute the sum of $75,000 each in cash, which also would be the amount of their capital account and that "under no circumstances shall either of them be required to make any additional capital contributions to the Joint Venture." The agreement further provided that CPC shall contribute and its capital account shall be equal to all additional cash requirements of the joint venture, regardless of the nature of such capital requirements, whether for operating capital, capital improvements, debt service require-ments, guaranteed payments, or for any other reason. In exchange for these capital contributions, CPC was entitled to a 50-percent ownership interest and Long and Center each were entitled to a 25-percent ownership interest.

Under the heading of Joint Venture Distributions, the agreement provided that Long and Center were to each receive preferential minimum guaranteed payments of $7,500 per year, payable quarterly, for 10 years or until they no longer had a positive capital account, whichever first occurred. To the extent of any excess cash flow, CPC was to receive certain guaranteed payments and when none of the venturers had a positive capital account, all net cash flow was to be distributed

according to the manner in which they shared net profits and net losses, which was as follows: CPC, 50 percent; Long, 25 percent; and Center, 25 percent. Furthermore, CPC and each of its partners jointly and severally agreed that if there was insufficient cash flow in any calendar year to pay Long and Center the guaranteed payments provided above, they would contribute, as additional capital, sufficient funds to insure that these payments would be made when due.

With respect to the duties and responsibilities of the joint venturers, the agreement provided as follows:

CPC is hereby appointed as agent of the Joint Venture to perform ministerial acts as may be established from time to time by the majority in interest of the Joint Venture and shall receive as compensation therefor an amount not to exceed five percent of the gross rental received by the Joint Venture. CPC is authorized to sell, on behalf of the Joint Venture, the property of the Joint Venture, but in no event at a price which will return to Long and Center less than $150,000.00, plus an amount equal to 12 percent simple interest per annum on the average quarterly capital account for Long and Center from the date of this Agreement to the date of any such sale, minus all payments of whatever type made to Long and Center at any time by the Joint Venture. * * *

The agreement also provided that:

All other powers, duties and responsibilities concerning or in any way involving the property, except as specifically set forth above, including, but not limited to, the right to mortgage, refinance or borrow funds for the Joint Venture, or to prepay, in whole or in part, refinance, recast, increase, modify, consolidate or extend any mortgages or loans affecting the property, shall not be taken or entered into unless written approval of a majority in interest of all the Joint Venturers is first obtained.

The agreement stated that any joint venturer had the right to call a meeting of the joint venture, such meeting to be held in Atlanta, Ga., by giving 10 days' written notice to the other joint venturers. It further provided that except as otherwise stated in the agreement any joint venturer—

shall have the right to give notice hereunder, and such notices under this Agreement shall be in writing and shall be given to the parties at the addresses herein set forth and to the Joint Venture at its principal office or such other address as any of the parties may hereafter specify in the same manner.

The agreement provided that upon dissolution and termination of the joint venture, the proceeds of liquidation were to be distributed in the following order of priority:

(i) To the payment of the debts and liabilities of the Joint Venture and the expenses of liquidation;

(ii) To the setting up of any reserves which the majority in interest of the Joint Venturers may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Joint Venture arising out of or in connection with the Joint Venture. * * *

(iii) To return to Long and Center the sum of $150,000.00, plus an amount equal to 12 percent simple interest per annum on the average quarterly capital account for Long and Center as defined in Paragraph 5 hereof from the date of this Joint Venture Agreement to the date of termination and liquidation, minus all payments of whatever type made to Long and Center at any time by the Joint Venture.

(iv) To return to CPC an amount equal to the balance remaining in their capital accounts.

(v) Any balance then remaining shall be distributed among all the Joint Venturers, pro-rata, in accordance with the amounts of their respective ownership in the Joint Venture.

CPC and each of its partners were to be jointly and severally liable for the distribution to Long and Center of the amount provided in paragraph (iii). Except for that guaranteed return, there was not to be any personal guarantee or liability for the return of the capital contributed by the other joint venturers. Rather, the return upon liquidation of the joint venture was to be made solely from the assets.

The joint venturers acknowledged in the agreement that Long and Center were entering into the joint venture with the understanding that the fair market value of the property was $892,771.71. In recognition of the fact that Long and Center made cash contributions to the capital of the joint venture which were not equal to the cash contributions made by CPC, the parties agreed that, for income tax purposes only, Long and Center were entitled to one-half of the total allowable depreciation on the assumption that the cost basis of the property was $892,772. The balance was allocated to CPC.

Finally, regarding the extent of the joint venture, the agreement stated that—

The parties hereto intend for this undertaking to be the creation and establishment of a Joint Venture, rather than the creation and establishment of a partnership, and to the extent permitted by law, consistent with maintaining the validity of this Agreement, these arrangements of this Agreement shall be determined to create a Joint Venture and not a partnership.

On March 31, 1975, the parties to the joint venture executed

an amendment to their agreement dated October 1, 1969. The purpose of the amendment was to relieve CPC of the obligation of having to guarantee the funding of the guaranteed payments to Long and Center and in return Long and Center's share of the liabilities was to be reduced. Accordingly, the amendment eliminated the guaranteed payments and it provided that if Long and Center had a positive capital account or if none of the venturers had a positive capital account, then all net cash flow was to be distributed quarterly 25 percent each to Long and Center and 50 percent to CPC.

The amendment also changed the manner in which the net profits and net losses of the joint venture were to be allocated. It provided that the net profits were to be apportioned among the joint venturers in accordance with the percentage ownership of each joint venturer. However, the net losses incurred after December 31, 1974, by the joint venture were to be allocated in proportion to the joint venturer's respective share of the joint venture liabilities. The joint venture liabilities were reallocated in the following manner:

Joint Venture liabilities equal to the greater of $750,000 or 50% of the Joint Venture's excess indebtedness shall first be allocated to CPC. The excess indebtedness of the Joint Venture for any fiscal year shall be determined by subtracting the amount of mortgage indebtedness on Joint Venture real property ("Mortgage Indebtedness") as of the end of the last fiscal year from the product obtained by multiplying cash flow of the Joint Venture for its last fiscal year by 10. Center and Long shall be allocated all Joint Venture liabilities less Joint Venture liabilities hereinabove allocated to CPC. For the purposes of this subparagraph only, "cash flow" of the Joint Venture shall mean cash revenues received by the Joint Venture less cash disbursements for interest expense on Mortgage Indebtedness.

The amendment concluded with the statement that—

All other terms, conditions and provisions set forth in the attached Joint Venture Agreement shall remain in full force and effect and shall not be amended or modified except as specifically set forth herein. The Joint Venturers hereby reaffirm and agree to be bound by all of the terms and conditions of the Joint Venture Agreement.

### III. The Exchange

Following the moratorium agreement executed in 1973 regarding the guaranteed payments to petitioners from the Lincoln Property partnership, the financial problems of that partnership continued. Over a period between 1973 and 1975,

petitioners Long and Center met with Frank Carter, one of the other partners, on several occasions to express their concern about their potential liability on the Franciscan Apartments. For a period of at least 6 months to a year prior to May 9, 1975, petitioners tried to figure several different ways to get out of the partnership. In early 1975, the Lincoln Property partnership began to default on its monthly mortgage payments to Teachers Insurance, and no payments were made between March 31, 1975, and May 9, 1975.[2] The discussions concerning a splitup of the partnership continued during the first part of 1975. Partners Crow, Pope, and Carter began having problems among themselves and at one point in the discussions they threatened to simply walk away from the partnership.

As of March 31, 1975, there were no definite agreements among the parties respecting a splitup of the Lincoln Property partnership although a number of possibilities had been discussed. Because of the large cash deficiencies and the large amount of debt, none of the partners wanted to remain in the Lincoln Property partnership. On the other hand, because the Lindbergh Apartments was a valuable piece of property, none of the partners were interested in giving up their interests in Venture Twenty-One. Sometime after March 31, 1975, the partners agreed that they would exchange their respective partnership interests on May 9, 1975. After completion of the exchange, Long and Center would own a 100-percent interest in Venture Twenty-One, and Crow, Pope, and Carter would own a 100-percent interest in Lincoln Property. Petitioners were of the view that although Venture Twenty-One had a negative cash flow, the Lindbergh Apartments would prove to be a valuable piece of property because it was in a good neighborhood and there had been talk of locating a Marta site near the apartments. Sometime prior to the date of the trial of this case, petitioners had sold the Lindbergh Apartments for $1 million and about a year or so later, the persons who purchased the property from petitioners had resold the apartments for $1,200,000.

---

[2]Some arrangements were made in 1975 with respect to the payment of the Lincoln Property mortgage. However, in a letter dated Feb. 24, 1978, addressed to all of the partners of Lincoln Property, including petitioners, Teachers Insurance declared the mortgage in default and demanded that the partners jointly and severally pay the balance due,

On May 9, 1975, CPC as grantors and Center and Long as grantees executed an agreement entitled "Assignment of Partnership Interest." In the agreement, the grantors assigned all of their rights, title, and interest in Venture Twenty-One to Center and Long. In addition, the agreement provided that the grantors assigned:

(c) Except as provided in subparagraph 2(d) below, all cash on hand and all deposits with banks and others; choses in action, causes of action, judgments, claims, bills, acceptances, accounts and notes receivable, advances, contracts, rights, leases, licenses, and other instruments of any nature whatsoever to which Grantors are party by virtue of the Joint Venture Agreement attached hereto as Exhibit "A";

(d) Grantees hereby acknowledge that tenant rental deposits of Venture 21 have heretofore been used to pay operating expenses of Venture 21, and as a result of said treatment and use, no assets constituting or representing tenant rental deposits are being transferred and assigned to Grantees hereunder. It is understood and agreed that Grantees hereby assume and agree to pay all liabilities for tenant rental deposits except for tenant rental deposits related to tenants who have vacated the Property as of March 31, 1975.

The agreement also provided that the grantors and grantees agreed to prorate between themselves as of the date of the agreement, the 1975 real estate taxes on the Venture Twenty-One property. On closing, petitioners paid Crow, Pope, and Carter the sum of $11,015 as their share of the property taxes. Also, the grantors were to pay all Georgia transfer taxes on the conveyance of their general warranty deed.

A similar agreement regarding the assignment of petitioners Long and Center's 50-percent partnership interest in Lincoln Property to Crow, Pope, and Carter was executed by the parties on the date of the exchange, May 9, 1975.

As part of the acquisition of the 50-percent interest of CPC in Venture Twenty-One, petitioners Long and Center assumed the liability jointly and severally for a promissory note in the principal amount of $400,000 which CPC had borrowed on behalf of Venture Twenty-One under the terms stated in the promissory note dated May 7, 1975. The agreement for the assumption of the debt was dated May 9, 1975. Mr. Leonard Berger, the holder of the promissory note, also executed a release of CPC from any and all obligations arising out of the promissory note which release was dated May 9, 1975.

In the closing statement on the exchange of their interests,

dated May 9, 1975, the parties to the exchange measured the values of the interest being transferred according to the following computation:

| | | |
|---|---:|---:|
| Value of real property | | $771,000 |
| Investments | | 400,000 |
| Total assets | | 1,171,000 |
| Less liabilities: | | |
| First mortgage | $296,279 | |
| Purchase-money note | 40,040 | |
| Other notes payable | 400,000 | |
| Advances from Center and Long | 12,811 | |
| Tenant Security deposits | 7,225 | |
| Total liabilities | | 756,355 |
| *Net* | | 414,645 |
| Less preference to Center and Long | | [1]145,192 |
| *Net Value for Distribution* | | 269,453 |
| *Interest of CPC #21* | | 134,726 |

[1] This distribution preference was computed in accordance with subsec. (a)(iii) of the joint venture agreement quoted at p. 1056 *supra*.

The accounting firm of Touche Ross & Co. prepared a document entitled "Financial Statements and Additional Information of Venture Twenty-One" for the period January 1, 1975, through May 9, 1975. One of the unaudited statements contained in the report was as follows:

VENTURE "21"
(a partnership)
STATEMENT OF ASSETS AND LIABILITIES
ARISING FROM CASH TRANSACTIONS
May 9, 1975
*Unaudited*
ASSETS

| | | |
|---|---:|---:|
| Cash | | $6,301 |
| Investments, at cost | | 400,000 |
| Deposit | | 105 |
| Property and equipment, at cost (pledged) (Note A): | | |
| Land | $64,567 | |
| Buildings | 653,201 | |

| | | |
|---|---:|---:|
| Furniture and appliances | $35,510 | |
| Swimming pool | 8,500 | |
| | 761,778 | |
| Less accumulated depreciation | 204,415 | $557,363 |
| | | 963,769 |

### LIABILITIES AND PARTNERS' INVESTMENT

| | |
|---|---:|
| Advance from Center and Long | $6,406 |
| Note payable—individual | 400,000 |
| Due to Crow, Pope, and Land management account | 3,977 |
| Tenants' deposits | 7,192 |
| Mortgages payable: | |
| Mortgage payable, $4,549 monthly with interest at 6% | 296,280 |
| Mortgage payable, $1,857 monthly with interest at 6½% | 40,040 |
| Total liabilities | 753,895 |
| Partners' investment (Notes A and B) | 209,874 |
| | 963,769 |

Touche Ross & Co. prepared a similar report for Lincoln Property for the period January 1, 1975, through May 9, 1975. Among the unaudited statements prepared was the following:

### LINCOLN PROPERTY COMPANY NO. FIVE
### OF ATLANTA, GEORGIA
(a partnership)
#### STATEMENT OF ASSETS AND LIABILITIES
#### ARISING FROM CASH TRANSACTIONS
May 9, 1975
*Unaudited*

| | | |
|---|---:|---:|
| Cash | | $80,953 |
| Deposits | | 562 |
| Loan costs, less amortization of $16,811 | | 41,848 |
| Property and equipment, at cost (pledged) (Note A): | | |
| Land | $137,569 | |
| Buildings | 3,045,960 | |
| Equipment | 121,583 | |
| Furniture | 173,950 | |
| | 3,479,062 | |

Less accumulated depreciation............ $1,513,634    $1,965,428
                                                          2,088,791

### Liabilities and Deficiency in Partners' Investment

Crow, Pope, and Land—advance ............................. $721,009
Tenants' deposits................................................    37,705
Long-term debt, mortgages payable $22,910
 monthly plus interest at 7⅛%; property
and equipment pledged as collateral ....................... 2,815,658
  Total liabilities ............................................. 3,574,372
Deficiency in partners' investment (Notes A and B)..... 1,485,581
                                                            2,088,791

As of May 9, 1975, the mortgages on the Franciscan Apartments and the Lindbergh Apartments did not exceed their respective fair market values.

During each of the years 1970 through 1974, petitioners Long and Center received distributions from Venture Twenty-One in the amount of $7,500 each. During the taxable period January 1, 1975, through May 9, 1975, petitioners received $1,875 each.

For the period January 1, 1975, through May 31, 1975, Venture Twenty-One reported on its Schedule K–1, Form 1065, U.S. Partnership Return of Income, that its partners' ending capital accounts were as follows: CPC ($262,441); Long ($24,409); Center ($24,408).

For the taxable period January 1, 1975, through May 31, 1975, the Lincoln Property partnership reported on its Schedule K–1 that its partners' ending capital accounts were as follows: Crow ($373,434); Pope ($186,715); Carter ($186,716); Long ($369,358); and Center ($369,358).

On their 1975 Federal income tax returns, petitioners did not report any gain on the exchange of their interests in Lincoln Property for the interests in Venture Twenty-One.

In the statutory notices of deficiency, respondent determined that petitioners each realized a long-term capital gain of $459,469 on their exchange of their 25-percent interests in

Lincoln Property in return for 25-percent interests in Venture Twenty-One.[3]

In the statutory notice of deficiency issued to petitioner Long, respondent determined that for the calendar year 1975 petitioner had a taxable gain of $207,950, due to the exchange of partnership interests, instead of a capital loss of $1,000 as claimed on his return. Accordingly, his income for the calendar year 1975 was increased by $208,950. Because there was no capital loss carryover from 1975 to 1976, respondent determined that petitioner Long had taxable capital gains for the calendar year 1976 in the amount of $6,725 instead of a capital loss of $1,000 claimed on the return. Accordingly, his income for the calendar year 1976 was increased by $7,725. Respondent also determined that petitioner Long was liable for the minimum tax on tax-preference items in the amount of $8,713 for the calendar year 1975. Finally, due to the increase in taxable income for 1975, respondent determined that petitioner Long was not eligible for income averaging for the calendar year 1976.

In the statutory notice of deficiency issued to petitioner

---

[3]Respondent's agent computed the gain as follows:

I

| | |
|---|---|
| First mortgage (Franciscan Apts.) | [1]$2,821,882 |
| Security deposits (Franciscan Apts.) | 35,375 |
| Total liabilities LPC No. 5 | 2,857,257 |

[1]$2,400,000 nonrecourse

II
VENTURE 21

| | | |
|---|---|---|
| First mortgage | 96,279 | (nonrecourse) |
| Purchase-money note | 40,040 | |
| Other note payable | 400,000 | |
| Advances | 12,811 | |
| Security deposits | 7,225 | |
| Total liabilities | 756,355 | |

III

| | | |
|---|---|---|
| FMV of property received | | 585,500 |
| Add: liabilities relieved | | 1,428,628 |
| Total amount received | | 2,014,128 |
| Less: basis in property given up | [1]$711,505 | |
| Liabilities assumed | 383,685 | 1,095,190 |
| Realized and recognized | | 918,938 |

---

[1]"$39,557 basis taken from taxpayers representatives plus additional liabilities as a result of nonrecognition of the amendment [of Mar. 31, 1975]."

Center, respondent determined that he had a taxable capital gain for the calendar year 1975 of $225,794 on the exchange of the partnership interests on May 9, 1975. As petitioner Center reported a capital loss of $1,000 on his return, his income for the calendar year 1975 was increased by $226,794. Finally, respondent determined that petitioner Center was liable for the minimum tax on tax-preference items in the amount of $1,097 for the calendar year 1975 and that due to the increase in his taxable income for the calendar year 1975, he was not eligible for income averaging in the calendar year 1976.

## OPINION

In order to determine whether the exchange by petitioners of their interest in Lincoln Properties for the interest of CPC in Venture Twenty-One is a like kind exchange, it is necessary to determine the nature of petitioners' interest in Venture Twenty-One. Respondent argues that Venture Twenty-One is a joint venture and not a partnership for the purpose of determining whether there was a like-kind exchange. In the alternative, respondent argues that Venture Twenty-One is a limited partnership. If respondent prevails on this issue, it would follow that the exchange was of a general partnership interest for a limited partnership interest (or a non-partnership interest) and, therefore, the exchange would not qualify as a like kind exchange under section 1031(a). *Estate of Meyer v. Commissioner*, 58 T.C. 311 (1972), affd. per curiam on this issue 503 F.2d 556 (9th Cir. 1974).

Respondent contends that Venture Twenty-One, as a joint venture, is not a partnership for the purposes of section 1031 because the joint venture agreement specifically stated that "The parties hereto intend for this undertaking to be the creation and establishment of a Joint Venture, rather than the creation and establishment of a partnership." The labels applied to a transaction for purposes of State law are not binding for Federal tax purposes. *Commissioner v. Estate of Bosch*, 387 U.S. 456 (1967); *Morgan v. Commissioner*, 309 U.S. 78, 81 (1940). See also *Luna v. Commissioner*, 42 T.C. 1067, 1077 (1964), in which we stated that the status of individuals as partners under State law is not binding for Federal tax purposes. Section 761(a) defines a partnership as follows:

For purposes of this subtitle, the term "partnership" includes a syndicate, group, pool, joint venture or other unincorporated organization through or

by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title [subtitle], a corporation or a trust or estate. * * *

Since a joint venture falls within the definition of a partnership for Federal income tax purposes, and the facts we have found clearly show that Venture Twenty-One satisfies the other requirements, we conclude that Venture Twenty-One is properly to be treated as a partnership for all Federal income tax purposes including section 1031. See *Madison Gas & Electric Co. v. Commissioner*, 72 T.C. 521, 558–563 (1979), affd. 633 F.2d 512 (7th Cir. 1980); *S. & M. Plumbing Co. v. Commissioner*, 55 T.C. 702 (1971); *Podell v. Commissioner*, 55 T.C. 429 (1970).

Respondent argues that if Venture Twenty-One is a partnership, petitioners' 50-percent interest therein was a limited partnership interest because of the following facts: petitioners were not personally liable on the mortgages of the partnership; the joint venture agreement provided that they would not be required to make any further contributions to capital; and the joint venture agreement stated that petitioners were to recover their initial investment of $150,000 plus 12 percent upon dissolution and liquidation of the joint venture. Respondent does not argue that Venture Twenty-One was formed as a limited partnership in compliance with Georgia law and clearly it was not.[4] Since Venture Twenty-One was not a limited partnership under Georgia law, and had many attributes of a general partnership, it is properly to be considered a general partnership in determining whether the exchange of an interest therein qualifies under section 1031. See *M.H.S. Co. v. Commissioner*, 575 F.2d 1177 (6th Cir. 1978), affg. per curiam a Memorandum Opinion of this Court; *Gulfstream Land & Development v. Commissioner*, 71 T.C. 587, 592 (1979); *Podell v. Commissioner*, *supra* at 431–432; *Luna v. Commis-*

---

[4]Georgia has adopted the Uniform Limited Partnership Act. Ga. Code Ann. sec. 75–402 provides that "A limited partnership is a partnership formed by two or more persons under the provisions of section 75–403." Ga. Code Ann. sec. 75–403(1) states that those persons desiring to form a limited partnership must sign a certificate which shall contain 14 enumerated items and then have it filed in the office of the clerk of the Superior Court of the county in which the principal place of business is located. Ga. Code Ann. sec. 75–403(2) provides that a limited partnership is also formed if there has been substantial compliance with the above-stated requirements.

*sioner, supra* at 1077–1078. See also Ga. Code Ann. secs. 75–101, 75–102; *Morgan Guaranty Trust Co. of New York v. Alexander Equities, Inc.*, 246 Ga. 60, 268 S.E.2d 660 (1980). From the facts we have set forth it is clear that petitioners' interests in Venture Twenty-One have all the indicia of general partnership interests. In fact, there were many similarities between the Lincoln Property partnership agreement and the Venture Twenty-One agreement, and respondent and petitioners both agree that Lincoln Property was a general partnership.

## I. Like-Kind Exchange

Having determined that the exchange was of a general partnership interest for a general partnership interest, it is necessary to determine whether the exchange qualifies for nonrecognition treatment under section 1031(a). Respondent argues that it does not qualify because (1) a partnership interest is excluded from the benefits of section 1031(a)[5] by the parenthetical language within that provision as it constitutes an evidence of interest; (2) section 741 is a specific provision in subchapter K which requires recognition of gain or loss on the sale or exchange of a partnership interest and it preempts the area; and (3) the underlying assets of the partnerships were not of a like kind.

In response to respondent's contentions, petitioners rely on two prior decisions of this Court—*Estate of Meyer v. Commissioner, supra*, a Court-reviewed opinion, and *Gulfstream Land & Development v. Commissioner, supra*, which they contend require a decision in their favor. The facts of both cases are very similar to those of the instant case. In *Meyer*, a son and father exchanged their California general partnership interests for a general and a limited interest, respectively, in a

---

[5]Sec. 1031(a) provides as follows:

SEC. 1031. EXCHANGE OF PROPERTY HELD FOR PRODUCTIVE USE OR INVESTMENT.

    (a) NONRECOGNITION OF GAIN OR LOSS FROM EXCHANGES SOLELY IN KIND.— No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.

California limited partnership. Prior to and after the exchange, both partnerships were principally engaged in the ownership and operation of rental apartments in San Francisco, Calif. After a careful review of the legislative history from which evolved the current list of property precluded from the benefits of section 1031 by the parenthetical exclusion, we rejected respondent's argument that a partnership interest could be characterized within the parenthetical as a "chose in action." We did so because the transactions at issue did not involve the trading of investment securities or similar intangibles which Congress had intended to exclude, but rather "were exchanges of proprietary (partnership) interests in one small business solely for proprietary (partnership) interests in a second small business, before and after which both businesses were going concerns engaged in the same principal activity." *Estate of Meyer v. Commissioner, supra* at 313 (fn. ref. omitted).

Respondent abandoned his "chose in action" argument in *Gulfstream* and instead characterized the exchanged partnership interests as "evidences of * * * interest" which also are within the parenthetical clause of section 1031(a). In *Gulfstream*, Gulfstream Land & Development Corp. (Gulfstream) was the common 100-percent parent of Gulfstream Republic (GR) and Gulfstream University (GU), and it owned two tracts of land consisting of 300 acres and 216 acres, respectively. In 1971, Gulfstream agreed to sell a one-half interest in the 300 acres to an unrelated corporation, Republic Properties, Inc. (Republic), and both corporations agreed to form a joint venture designated Nob Hill Co., to which they contributed their respective interests in the land. Gulfstream's interest was later assigned to its subsidiary, GR. In 1972, Gulfstream agreed to sell a one-half interest in the 216 acres to an unrelated corporation, All Seasons Development Corp. (All Seasons), and both corporations agreed to transfer their one-half interests to a joint venture formed by them designated "Plantation Hills Co." Gulfstream later transferred its interest to its subsidiary, GU. Both joint ventures were formed to develop and improve the land, building primarily single-family residential homes. Thereafter, GR exchanged its joint venture interest in the Nob Hill Co. for the joint venture interest held by All Seasons. The result of this exchange was that Gulfstream's two subsidiaries, GR and GU, were coventurers in the

Plantation Hills Co., and the unrelated companies, Republic and All Seasons, were coventurers in the Nob Hill Co.

Once again, we rejected respondent's argument that the exchange of partnership interests was within the parenthetical exclusion of section 1031(a). We held that *Meyer's* broad analysis of the legislative history of the parenthetical was not a specific rejection of respondent's characterization of a partnership interest as a "chose in action," but rather was a more general conclusion that a general partnership interest was simply not the type of property intended by Congress to fall within the parenthetical exclusion. In the instant case, respondent again makes a detailed argument based on the legislative history of the parenthetical. We decline respondent's offer to overrule our two prior cases and, accordingly, conclude that a partnership interest is not excluded from the benefits of section 1031.

Although the exchange of partnership interests is not excluded from section 1031, before nonrecognition treatment is allowed, we must determine whether the exchange qualifies under the operative language of section 1031(a). This determination is made, according to *Meyer* and *Gulfstream*, by examining both the exchange and the partnership interests themselves. This analysis emanates from the concluding paragraph in *Meyer* in which we expressed no opinion on a transaction where there were differing types of underlying assets involved or where the two partnerships were not engaged in the same principal activity. *Gulfstream* expanded on these concerns expressed in *Meyer,* and we stated therein that in order to prevent the use of the partnership form to convert an otherwise nonqualifying exchange into a qualifying one, we would apply the judicial doctrine of substance over form and look through to the underlying assets. In making this analysis, it should be emphasized that the determination of whether the exchange initially qualifies as like kind under section 1031(a) will be applied to the partnership interests and not on a partnership-asset-by-partnership-asset approach. See *Gulfstream Land & Development v. Commissioner, supra* at 594.

Although the exchange of the partnership interests herein satisfies the like-kind requirement, we must also analyze the underlying assets of the partnerships to make sure that the

substance of the transaction comports with the form. As we stated in *Gulfstream*, we must look through the interests to the assets to make sure that the exchange of partnership interests does not shield a transaction which could not have otherwise qualified under section 1031(a). First, it is beyond dispute that the predominate underlying properties of both partnerships were substantially the same, as they were both residential rental apartment complexes held for investment. However, respondent argues that the receipt by petitioners of the 50-percent interest in Venture Twenty-One, which listed among its total assets of $1,006,406, investments in the amount of $400,000, and the great disparity in the amount of mortgages encumbering the respective partnership property, transforms the exchange into one of non-like-kind property for which there is full recognition of gain.

Respondent's argument that the imbalance in the amount of mortgages causes the exchange to fall outside section 1031 is without merit. As will be discussed more fully below, the excess of liabilities relieved over liabilities assumed constitutes "other property or money" (boot) under section 752(d) and section 1031(b). Sec. 1031(d); sec. 1.1031(b)–1(c), Income Tax Regs. Where boot is involved, section 1.1031(a)–1(a), Income Tax Regs., provides that an exchange will not be totally excluded from section 1031 because nonqualifying property is also received in the exchange. Rather, the transaction still remains as an exchange described in section 1031(a), except that section 1031(b) operates to require recognition of gain to the extent of the boot received.[6]

However, we do agree with respondent that since the $400,000 of investments held by Venture Twenty-One were derived from the $400,000 note signed 2 days before the exchange, it appears that the partnership form may in fact have been used to shield nonqualifying property from recogni-

---

[6]Sec. 1031(b) provides as follows:

(b) GAIN FROM EXCHANGES NOT SOLELY IN KIND.—If an exchange would be within the provisions of subsection (a), of section 1035(a), of section 1036(a), or of section 1037(a), if it were not for the fact that the property received in exchange consists not only of property permitted by such provisions to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

tion. If a liability and a matching investment are incurred by a partnership before an exchange in order to equalize the transaction, and the amount of boot is computed not on an asset-by-asset approach but through the application of the recognition provisions of section 751 and 752 in subchapter K, which provisions respect the partnership entity, then the investments would not be counted as boot received because neither section 751 nor 752 would specifically require recognition. This is precisely the situation we are presented with herein. The $400,000 liability will increase the partners' basis in Venture Twenty-One under section 752(a) and section 722. One-half of the liabilities, or $200,000, constitutes a liability assumed by petitioners Center and Long which is offset against the Lincoln Property liabilities relieved. Sec. 1.1031(b)–1(c), Income Tax Regs. As there is no corresponding provision in subchapter K to require recognition of gain for the one-half of investments held by Venture Twenty-One, which are received in the exchange, petitioners Center and Long have reduced their boot received in the amount of $200,000 by simply borrowing $400,000 and holding the proceeds as investments pending completion of the exchange.

It is obvious that the borrowing of money and retaining the proceeds so close in time to an exchange can produce great tax benefits for exchanging partners. This is precisely the type of abuse which brought us in *Gulfstream* to remind taxpayers that we will not ignore the underlying substance of a partnership exchange. Once again, we repeat that we will carefully scrutinize each transaction to protect the spirit of section 1031 and make sure that the substance accurately reflects the form.

In the instant case, a careful analysis leads us to conclude that the $400,000 of liabilities was incurred by Venture Twenty-One in an attempt to avoid boot to petitioners in the exchange. However, this fact does not cause the exchange to fall outside the provisions of section 1031. As will be more fully discussed below, the operation of section 1031(b) requires full recognition of the gain in this case.

## II. Recognition of Gain

*Meyer* and *Gulfstream* only addressed the question of whether an exchange of partnership interests qualifies as a like-kind exchange under section 1031. Neither party has

directed our attention to, nor have we found any cases which have dealt with, the problem of whether gain realized on a partnership exchange should be recognized to the extent of boot received as provided in section 1031(b) and, if so, exactly how the amount of boot received should be computed. The two alternatives are: (1) On a partnership-asset-by-partnership-asset basis as if the entity itself did not exist; cf. *Williams v. McGowan*, 152 F.2d 570 (2d Cir. 1945); or (2) on a partnership entity basis which would result in recognition only to the extent provided in subchapter K, namely sections 751 and 752.

In *Meyer* and *Gulfstream*, we held that in order to be entitled to nonrecognition treatment under section 1031(a), the requirements of that section were to be applied to partnerships as entities rather than on an aggregate theory in which the entity would be disregarded and the exchange would be tested on an asset-by-asset basis.[7] We recognize that in *Gulfstream*, in addition to a comparison of the partnership interests exchanged, we also looked through the partnership to the underlying assets in determining whether the exchange met the requirements of section 1031(a). However, the examination of the underlying assets is aimed at preventing any abuse of section 1031(a) when partnership interests are exchanged, rather than adopting the aggregate theory in determining whether the requirements of section 1031(a) are initially met. We reaffirmed our entity approach when we stated that "section 1031(a) focuses on the assets actually exchanged, which are partnership interests and not the underlying assets of the partnerships." *Gulfstream Land & Development v. Commissioner, supra* at 595.

Because we have predominently relied upon the entity theory of partnerships in our analysis of whether the exchange qualified under section 1031(a), we conclude that the determination of gain recognized under section 1031(b) should also be based on the entity theory. In addition to the consistency resulting from this approach, in our view, it is the correct approach for the following reasons: (1) It respects the special

---

[7]For a historical discussion of these two competing theories, see J. Crane & A. Bromberg, Law of Partnership, sec. 3 (1968); 1 W. McKee, W. Nelson & R. Whitmire, Federal Taxation of Partnerships and Partners, par. 1.02 (1977); 1 A. Willis, Partnership Taxation, secs. 2.01–2.04 (2d ed. 1976).

recognition provisions within subchapter K, sections 751 and 752(d), which become operative upon the "sale or exchange" of a partnership interest; (2) due to the requirement that the underlying assets of each partnership be of like kind, there is a substantial probability that the balance sheets of the exchanged partnerships will be similar, thus reducing any inequities which might otherwise result from the entity approach;[8] and (3) numerous technical problems which would arise if the aggregate approach were adopted are avoided, such as the computation of the adjusted basis of the various partnership properties, the computation of a partner's basis in his partnership interest, and the allocation of such basis adjustments among the partnership assets.[9]

Based on our conclusion that the entity approach is proper, the amount of the boot received will be computed according to the provisions in subchapter K. We will first consider the treatment of liabilities of the exchanged partnerships under section 752. Section 752(a)[10] provides that an increase in a partner's share of the liabilities of a partnership will be treated as a contribution of money by that partner to the partnership, thus increasing the partner's basis in his partnership interest under section 722. Section 752(d)[11] provides that upon the sale or exchange of a partnership interest, liabilities

---

[8]If additional consideration was received in the exchange which was not partnership property, the nonqualifying property would most certainly be classified as boot under sec. 1031(b). Furthermore, all contributions of property to a partnership and indebtedness incurred at or near the time of the exchange will be carefully scrutinized, as we have done herein, to insure that such activities are not undertaken for tax-avoidance purposes, and we will not hesitate to apply other judicially created theories such as the "sham" and "step transaction" doctrines. Cf. *Crenshaw v. United States*, 450 F.2d 472 (5th Cir. 1972).

[9]For a general discussion, see Chromow, "Tax-Free Exchanges of Partnership Interests: Gulfstream Land and Rev. Rul. 78–135 Impose Constraints," 57 Taxes 651 (1979).

[10]Sec. 752(a) provides as follows:

(a) INCREASE IN PARTNER'S LIABILITIES.—Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership.

In addition, sec. 752(c) provides that—

For purposes of this section, a liability to which property is subject shall, to the extent of the fair market value of such property, be considered as a liability of the owner of the property.

[11]Sec. 752(d) provides as follows:

(d) SALE OR EXCHANGE OF AN INTEREST.—In the case of a sale or exchange of an interest in a partnership, liabilities shall be treated in the same manner as liabilities in connection with the sale or exchange of property not associated with partnerships.

will be treated in the same manner as liabilities outside the partnership context. Under this section, the rule of *Crane v. Commissioner*, 331 U.S. 1 (1947), is applicable when a partnership interest is sold or exchanged. Under the holding in the *Crane* case, because a taxpayer's basis in property is increased by the amount of liabilities secured by the property, whether the property is taken subject to the liabilities or the liabilities are assumed, the relief of liabilities is included in the amount realized upon disposition of the property. See *Tufts v. Commissioner*, 70 T.C. 756, 768–769 (1978), revd. 651 F.2d 1058 (5th Cir. 1981).

Section 1031(d)[12] provides that for the purposes of section 1031 where another party acquires property from a taxpayer subject to a liability, the amount of the liability is treated as money received in the exchange. Section 1.1031(b)–1(c), Income Tax Regs.,[13] provides that where a taxpayer is relieved of liabilities in an exchange of property, such liabilities may be offset, against liabilities on the property received in the exchange subject to such liabilities, as liabilities assumed by the taxpayer. Sec. 1.1031(d)–2, example (2), Income Tax Regs. Section 1031(b) provides that gain realized on the exchange is recognized to the extent of money received. Following the statutory language outlined above, petitioners Center and Long must recognize gain on the exchange to the extent that the liabilities of which they were relieved in the transfer of their 50-percent interests in Lincoln Property exceed the liabilities they assumed in their receipt of CPC's 50-percent interest in Venture Twenty-One.

---

[12]Sec. 1031(d) provides in part as follows:

For purposes of this section, section 1035(a), and section 1036(a), where as part of the consideration to the taxpayer another party to the exchange assumed a liability of the taxpayer or acquired from the taxpayer property subject to a liability, such assumption or acquisition (in the amount of the liability) shall be considered as money received by the taxpayer on the exchange.

[13]Sec. 1.1031(b)–1(c), Income Tax Regs., provides as follows:

(c) Consideration received in the form of an assumption of liabilities (or a transfer subject to a liability) is to be treated as "other property or money" for the purposes of section 1031(b). Where, on an exchange described in section 1031(b), each party to the exchange either assumes a liability of the other party or acquires property subject to a liability, then, in determining the amount of "other property or money" for purposes of section 1031(b), consideration given in the form of an assumption of liabilities (or a receipt of property subject to a liability) shall be offset against consideration received in the form of an assumption of liabilities (or a transfer subject to a liability). * * *

The partnership liabilities of Lincoln Property on May 9, 1975, the date of the exchange, consisted of a mortgage on the apartment complex in the amount of $2,815,658[14] plus tenants' deposits in the amount of $37,705 for total liabilities of $2,853,363. The liabilities of Venture Twenty-One were as follows: advance from Center and Long, $6,406; note payable, $400,000; due Crow, Pope, and Land management account, $3,977; tenants' deposits, $7,192; and mortgages payable of $40,040 and $296,280 for total liabilities of $753,895.

In allocating the partnership liabilities among the partners, section 1.752–1(e), Income Tax Regs., states the general rule that liabilities of a general partnership are allocated according to a partner's ratio for sharing losses under the partnership agreement. A limited partner is entitled to a share of the limited partnership's liabilities only to the extent of the difference between the total contribution he is required to make under the limited partnership agreement and his actual contribution made to the partnership. The regulation also provides, however, that—

where none of the partners have any personal liability with respect to a partnership liability (as in the case of a mortgage on real estate acquired by the partnership without the assumption by the partnership or any of the partners of any liability on the mortgage), then all partners, including limited partners, shall be considered as sharing such liability under section 752(c) in the same proportion as they share the profits. * * *

We have found as a fact that of the $2,815,658 in total liabilities of Lincoln Property, Crow, Pope, and Carter were personally liable to the extent of $1,191,458.21. Although the entire amount of the consolidated mortgage was secured by the Franciscan Apartments, which was owned by Lincoln Property, the remaining balance was nonrecourse. The secured mortgage on the Lindbergh Apartments, which was owned by Venture Twenty-One, was all nonrecourse. The entire amount of these respective liabilities is to be considered partnership liabilities under section 752(c)[15] because the partnerships were the owners of the property and the liabilities to

---

[14]Although there were different figures set forth as the stated amounts of both partnerships' liabilities, we have adopted the figures listed on the unaudited statements of assets and liabilities prepared by Touche Ross & Co.

[15]Sec. 752(c) reads as follows:

which they were subject did not exceed their fair market value.

Where partners are liable other than in their capacity as partners, as in the case of Crow, Pope, and Carter in Lincoln Property, section 1.752–1(f), Income Tax Regs., provides the following limitation:

In determining the amount of liabilities for the purposes of section 752 and this section, the amount of an indebtedness is to be taken into account only once, even though a partner (in addition to his liability for such indebtedness as a partner) may be separately liable therefor in a capacity other than as a partner.

Reading this provision together with section 752(c), and recognizing that three partners are personally liable other than in their capacity as partners (although to a limited extent) on the Lincoln Property mortgages, we conclude that all of the general partners of Lincoln Property including petitioners Long and Center will share the total partnership liability in the same proportion as they share partnership losses. Sec. 1.752–1(e), Income Tax Regs. See generally 1 A. Willis, Partnership Taxation, sec. 22.01–08 (2d ed. 1976). On the other hand, since none of the partners of Venture Twenty-One are liable on the mortgage indebtedness to which its property is subject, all of the general partners including petitioners will share the partnership liability in the same proportion as they share partnership profits. Sec. 1.752–1(e), Income Tax Regs. See *O'Brien v. Commissioner*, 77 T.C. 113 (1981).

Petitioners Long and Center collectively had a 50-percent (25 percent each) interest in the profits and losses of Lincoln Property and a 50-percent interest in the profits and losses of Venture Twenty-One at all times prior to March 31, 1975. Therefore, since petitioners' share of the profits and losses of both partnerships was the same, their share of the liabilities will be 25 percent each unless we determine that the amendment of March 31, 1975, to the partnership agreement of Lincoln Property, which changed their share of partnership

---

(c) LIABILITY TO WHICH PROPERTY IS SUBJECT.—For purposes of this section, a liability to which property is subject shall, to the extent of the fair market value of such property, be considered as a liability of the owner of the property.

losses by reallocating the partners' respective shares of the mortgage liabilities, is to be given effect.

As stated above, petitioners' share of partnership losses under the original Lincoln Property partnership agreement dated April 5, 1968, was 50 percent. The parties changed this allocation pursuant to an amendment dated March 31, 1975. The amendment provided that losses were to be allocated in proportion to their share of the partnership liabilities. The liabilities allocated to petitioners were equal to the greater of $750,000 or 50 percent of the partnership's "excess indebtedness" which was to be calculated according to a formula set out in the amendment. Based on the above allocation, petitioners' share of the liabilities of Lincoln Property on May 9, 1975, was $756,680.[16]

---

[16]It is undisputed that the effect of their agreement was to reduce petitioners' share of the total liabilities of Lincoln Property from $1,426,681 to $756,680 for a net reduction of $670,001. Sec. 752(b) provides that a decrease in a partner's share of the partnership's liabilities is to be considered as a distribution of money to the partner by the partnership. Conversely, an increase in a partner's share of the partnership's liabilities is treated as a contribution of money to the partnership under sec. 752(a). The result, then, of the amendment was that petitioners received a distribution of money from the partnership in the amount of $670,001 which, under sec. 733, would result in a reduction in the adjusted basis of their partnership interest. It would cause a recognition of gain to petitioners Center and Long under sec. 731(a) only to the extent that the distribution exceeded the adjusted basis in their partnership interest immediately prior to the distribution. The question of gain recognition, if any, depends upon petitioners' basis in their partnership interest and on this issue, the parties herein are unable to agree on exactly what that basis was. Respondent alleges that the basis was $711,505 which figure assumes that the basis without increase for liabilities was $39,557 and that the amendment was ineffective to shift the partners' share of the liabilities. Petitioners contend that their basis was $17,963, which figure assumes that the amendment was valid. Neither party computed the basis using the other party's assumption nor did they set out the formula used so that we can trace the respective computations in order to determine who was correct. Therefore, under the authority granted in sec. 705(b), we will use the alternative method of computing the partners' basis because it is clear that the "circumstances are such that the partner cannot practicably apply the general rule set forth in section 705(a)." Sec. 1.705–1(b), Income Tax Regs. We conclude that the use of this method will be especially appropriate in this case because petitioners contributed only cash and not property to the partnership, there have been no transfers or distributions of partnership property after petitioners became partners, and the partnership agreement provided that all liabilities, except those among the partners, were to be satisfied first upon termination, with the balance of the property to be distributed to the partners in proportion to their respective capital accounts. See 1 W. McKee, W. Nelson & R. Whitmire, Federal Taxation of Partnerships and Partners, par. 6.04–05 (1977). Therefore, since petitioners Long and Center both had a negative capital account of ($369,358) on May 9, 1975 (we recognize that sec. 731(a) states that the adjusted basis is to be computed immediately before the distribution, Mar. 31, 1975; however, as will later be evident, no gain was in fact recognized on the shift of liabilities under the agreement), and they each had a 25-percent share of liabilities, their respective bases would be computed as follows: ($369,358) plus $713,341 (25 percent of total liabilities of $2,853,363) equals

Petitioners argue that the amendment should be respected because they were very concerned about the extent of their potential personal liability, especially since the partnership was having serious cash flow problems, to the extent that the partnership was in default on its mortgage payments in early 1975, and that in return for a limitation of their liability, petitioners agreed to relinquish all rights to their quarterly guaranteed payments for which Crow, Pope, and Carter were personally liable. Respondent's principal contentions are that the amendment was entered into in order to avoid boot under section 1031(b) on the subsequent exchange and that the allocations had no economic substance.

In considering the validity of any adjustment agreed to by the parties so close in time to the date of the exchange, the documents and the transaction as a whole should be carefully scrutinized to make sure that the form accurately reflects the substance. The form will not be permitted to control over the substance where the form was chosen merely to alter the tax liabilities of the parties. *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945); *Gregory v. Helvering*, 293 U.S. 465 (1935). See also *Holladay v. Commissioner*, 72 T.C. 571 (1979), affd. 649 .F.2d 1176 (5th Cir. 1981); *Gulfstream Land & Development v. Commissioner, supra* at 595; *Kresser v. Commissioner*, 54 T.C. 1621 (1970).

An agreement to reallocate the liabilities among the partners of Lincoln Property within 6 weeks of an admittedly complicated transaction involving the like-kind exchange of property, where an excess of liabilities relieved over liabilities assumed constitutes boot under sections 752(d) and 1031(b), clearly raises some suspicions about the intent of the parties. However, before we consider whether the agreement purporting to reallocate liabilities has substance aside from its effect on tax liabilities, we must be satisfied that the tax liabilities of the respective parties may have been changed in some way by

---

$343,983. See sec. 1.705–1(b) (example (*3*), Income Tax Regs. As a result, each of petitioners' basis as of May 9, 1975, was $343,983 or a combined adjusted basis of $687,966, if the Mar. 31 agreement is ignored. If the Mar. 31 agreement is given effect, their basis of $343,983 must then be reduced for the reduction in liabilities of $335,000 (one-half of the total reduction of $670,001) pursuant to sec. 733. Accordingly, no gain was recognized under sec. 731(a), and petitioners are left with an adjusted basis of $8,983 or a combined adjusted basis of $17,966.

the agreement. Based on a comparison of our basis calculations with petitioners', it is obvious that petitioners reduced their basis under section 733 to take into account their reduction in liabilities provided for by the March 31, 1975, agreement. As long as petitioners reduced their basis, no tax difference would have resulted had petitioners disposed of their partnership interests in a transaction under which gain was recognized. See section 731(a) which provides that gain is recognized on a distribution of money from a partnership to a partner only to the extent that the distribution exceeds the partner's basis in his partnership interest[17] This conclusion is reached because gain would result only at the point in time in which the distributions exceeded the partner's basis.

The significance of the March 31, 1975, reallocation becomes apparent when the provisions of subchapter K are combined with the operation of section 1031. The result of the interplay of subchapter K with the nonrecognition provision of section 1031 is that the parties can delay the recognition of gain resulting from an excess of liabilities relieved by simply equalizing the liabilities through a reallocation of liabilities among the exchanging partners. Although the amount of gain which should be recognized is preserved due to the reduction in basis, the partners could always avoid boot in this manner as long as they have a sufficient basis to absorb the decrease in liabilities.

Therefore, we conclude that the March 31, 1975, amendment did affect the tax liabilities of the parties because of the section 1031 exchange. It follows that we must then determine whether there was any economic substance to the agreement aside from its tax effects. Petitioners argue that there were valid business reasons for the March 31 agreement. First, petitioners state that they were concerned about their potential liability on the Lincoln Property mortgages because the partnership was in such a poor cash position that it failed to meet some of its monthly debt payments in early 1975. Second,

---

[17]Amendments to the partnership agreement by the partners are permitted and will be effective (absent the limitation in sec. 704(b)(2) and sec. 1.704–1(b)(2), Income Tax Regs., and the underlying requirement that all allocations must have economic substance. See *Holladay v. Commissioner*, 72 T.C. 571 (1979), affd. 649 F.2d 1176 (5th Cir. 1981); *Kresser v. Commissioner*, 54 T.C. 1621 (1970)) if they are adopted prior to or at the time the partnership return is due for that taxable year. Sec. 761(c).

petitioners contend that they gave consideration for the liability reduction in the form of the cancellation of past unpaid and all future guaranteed payments.

Although petitioners' arguments on this issue appear reasonable, they do not withstand careful analysis. Neither petitioners nor the partnership had assumed personal liability on the mortgages. The only recourse that the mortgagee, Teachers Insurance, had in the event of default was to first foreclose on the apartment complex and then, to the extent of any deficiency, Crow, Pope, and Carter were personally liable only on the portion of the mortgage evidenced by the note for $1,300,000. In addition, the "Third Supplement to Security Deed" dated June 2, 1970, specifically stated that—

Long and Center shall not be personally liable on account of or pursuant to any event of default committed by Crow, Pope and Carter or any other person liable under any evidence of said consolidated indebtedness or any part thereof secured by the Amended Security Deed or other related loan documents. * * *

The underlying purpose of the Lincoln Property amendment becomes clear when it is compared with the activities connected with Venture Twenty-One prior to the exchange. On the same date, March 31, 1975, the partners also executed an identical amendment to the joint venture agreement which reallocated the liabilities of Venture Twenty-One. In the Lincoln Property amendment, the greater of $750,000 or 50 percent of the partnerships' "excess indebtedness," which amounted to $756,680, was allocated to partners Center and Long. The balance of the liabilities were then allocated to partners Crow, Pope, and Carter. In the Venture Twenty-One amendment, the greater of $750,000 or 50 percent of the joint venture's "excess indebtedness" was allocated to Crow, Pope, and Carter with the excess being allocated to Center and Long. Prior to May 7, 1975, the total liabilities of Venture Twenty-One only amounted to $353,895. In order to increase the liabilities, Crow, Pope, and Carter borrowed $400,000 from an individual, evidenced by a note payable dated May 7, 1975, and the proceeds were listed on the Venture Twenty-One balance sheet as "investments." As a result, liabilities in the amount of $750,000 were allocated to Crow, Pope, and Carter.

The end result of these amendments and the additional liability incurred on behalf of Venture Twenty-One was that

instead of the excess of liabilities relieved (which constitutes boot received under sec. 1031(b)) over liabilities assumed by Center and Long being $1,049,734 (one-half of $2,853,363, or $1,426,681 minus one-half of $753,895, or $376,947) it was $6,680 ($756,680 minus $750,000). Although petitioner Long testified at trial that the $400,000 was borrowed by the other partners to repair the roof, petitioners introduced no evidence showing that the money was actually used for such purpose. In any event, even if it has been so used, the debt was simply incurred too close to the date of the actual exchange and the resulting amounts were too equal for us to believe that the partners did not have an intent to alter the tax results of the exchange by this borrowing. Considering the relationship of the two agreements of March 31, 1975, and the borrowing of $400,000 by Venture Twenty-One on May 7, 1975, we are convinced that the March 31, 1975, amendments were entered into solely to reduce the amount of boot received by petitioners in the exchange, thus reducing their potential tax liabilities. For that reason, we conclude that no effect should be given to the March 31, 1975, amendments to the agreements of the partnerships and we will proceed on the assumption that for tax purposes they are to be disregarded. See *Holladay v. Commissioner, supra*; *Kresser v. Commissioner, supra*.

On this basis, we turn to the computation of the amount of gain realized and the amount of gain recognized on the exchange. In their computations, petitioners assumed that the fair market value of the Lindbergh Apartments held by Venture Twenty-One was $771,000. At trial, respondent presented a well qualified expert who valued the property in his written report at $600,000. Petitioner submitted no evidence to the contrary and made no objection to respondent's requested finding that the fair market value of the Lindbergh Apartments on May 9, 1975, was $600,000. Based on the evidence and the expert's valuation report, we agree with respondent that the fair market value of the apartments on the date of the exchange was $600,000. As a result, the amount of the total gain realized on the exchange by the two petitioners was $853,956.[18]

---

[18]The computation of gain realized is contained in note 29 *infra*.

As petitioners held a 50-percent interest (25 percent each) in profits and losses of both partnerships, 50 percent of the liabilities are allocated to them as required by section 1.752–1(e), Income Tax Regs. Therefore, due to an excess of liabilities relieved over liabilities assumed, petitioners must recognize their gain realized of $853,956 on the exchange under section 1031(b) to the extent of the boot received. The amount of boot received in the form of the excess of liabilities relieved was in the amount of $1,049,734 ($1,426,681 relieved less $376,947 assumed), and, therefore, the entire amount of gain realized must be recognized.

The other provision in subchapter K which expressly requires the recognition of gain on the sale or exchange of a partnership interest is section 751. Section 751(a)[19] provides that to the extent of the fair market value of property and money received by a partner in exchange for his partnership interest which is attributable to unrealized receivables or substantially appreciated inventory held by the partnership, such amounts are treated as realized from the sale or exchange of a noncapital asset. The express purpose is to override the general capital gain rule of section 741 where there would otherwise be a conversion of potential ordinary income into capital gain upon a sale or exchange of a partnership interest. See S. Rept. 1622, 83d Cong., 2d Sess. 98 (1954).

From the facts presented, it is apparent that of the two classes of section 751 property, the Lincoln Property partnership might have held "unrealized receivables" as defined in section 751(c)[20] on the date petitioners exchanged their inter-

---

[19]Sec. 751(a) reads as follows:

SEC. 751. UNREALIZED RECEIVABLES AND INVENTORY ITEMS.

(a) SALE OR EXCHANGE OF INTEREST IN PARTNERSHIP.—The amount of any money, or the fair market value of any property, received by a transferor partner in exchange for all or a part of his interest in the partnership attributable to—

(1) unrealized receivables of the partnership, or

(2) inventory items of the partnership which have appreciated substantially in value, shall be considered as an amount realized from the sale or exchange of property other than a capital asset.

[20]Sec. 751(c) reads in part as follows:

(c) UNREALIZED RECEIVABLES.—For purposes of this subchapter, the term "unrealized receivables" includes, to the extent not previously includible in income under the method of

ests therein.[21] Whether Lincoln Property did in fact have "unrealized receivables" is dependent upon whether depreciation recapture would result under sections 1245 and 1250 if the assets were sold by the partnership at their fair market value on the date of the exchange. In order to compute the amount, if any, of recapture, it would be necessary to know the fair market value and basis of the property and the method and amount of depreciation. See sec. 1.751–1(d)(4), Income Tax Regs. Because the parties did not present us with a breakdown of the above-stated information, we are unable to compute the amount, if any, of recapture and thus the amount, if any, of ordinary income recognized on the exchange.[22] More importantly, respondent did not determine in the notice of deficiency or contend at the trial that any amount of the gain he determined on the exchange was ordinary income. We mention the provisions of section 751 only because to some extent this section explains the problem raised by respondent with respect to petitioners' basis in the Venture Twenty-One partnership hereinafter discussed.

In summary, we conclude that petitioners must recognize a total long-term capital gain of $853,956 on the like-kind exchange of their partnership interests under section 1031(b).

accounting used by the partnership, any rights (contractual or otherwise) to payment for—

(1) goods delivered, or to be delivered, to the extent the proceeds therefrom would be treated as amounts received from the sale or exchange of property other than a capital asset, or

(2) services rendered, or to be rendered.

For purposes of this section and sections 731, 736, and 741, such term also includes * * * section 1245 property (as defined in section 1245(a)(3)), section 1250 property (as defined in section 1250(c)) * * * but only to the extent of the amount which would be treated as gain to which section * * * 1245(a), 1250(a) * * * would apply if (at the time of the transaction described in this section or section 731, 736, or 741, as the case may be) such property had been sold by the partnership at its fair market value.

[21]We assume, and there were no facts presented to the contrary, that petitioners were not dealers in real property so as to vicariously cause the real property held by the partnership to become an "inventory item" under sec. 751(d)(2)(A) as required by sec. 751(d)(2)(D).

[22]We note in passing that there are a number of technical problems which remain to be resolved in the interaction of sec. 751, 1031, 1245, and 1250, the most important of which is the reconciliation of secs. 1245(b)(4) and 1250(d)(4) with sec. 751(c). Where there is an exchange which qualifies under sec. 1031(a), the recapture provisions state that the amount of recapture is not to exceed an amount, a portion of which is made up of the amount of gain recognized "determined without regard to this section." However, sec. 751(c), which triggers the inquisition into the amount of recapture, refers back to secs. 1245 and 1250 by stating that recapture is to be recognized "only to the extent of the amount which would be treated as gain to which * * * section 1245(a), 1250(a) * * * would apply" if the property had been sold by the partnership at its fair market value.

## III. Step-Up in Basis

The next question presented is whether petitioners are entitled to a step-up in the basis of their partnership interests for all or any part of the gain recognized. The resolution of this issue is necessary in order to determine the proper amount of depreciation on the Venture Twenty-One assets after the exchange.[23] Petitioners contend that they are entitled to a full step-up in basis under the following statutory analysis. Section 1031(d)[24] provides that the basis of petitioners' 50-percent partnership interest in Venture Twenty-One received in the exchange is equal to the basis in the property exchanged, a 50-percent partnership interest in Lincoln Property, plus the gain recognized on the exchange. However, as a result of the exchange of a 50-precent interest, Venture Twenty-One terminated under section 708(b)(1)(B).[25] The effect of the termination is that the partnership makes a liquidating distribution to petitioners in which no gain or loss is recognized to the partners under section 731(a) or to the partnership under section 731(b).[26] The bases of the partnership assets distributed are then stepped up as provided in section 732(b) to equal the adjusted basis of the partners' interest in the partnership,

---

[23]In their petitions, petitioners allege that they are entitled to a step-up in basis of the Venture Twenty-One property if they are required to recognize gain. At the trial, petitioners' counsel specifically stated that petitioners were claiming an adjustment in depreciation in 1975 because of the increase in basis of the Venture Twenty-One property if the Court held that gain was recognized on the exchange. Respondent's counsel made no objection to this issue's being litigated.

[24]Sec. 1031(d) provides in part as follows:

(d) BASIS.—If property was acquired on an exchange described in this section, section 1035(a), section 1036(a), or section 1037(a), then the basis shall be the same as that of the property exchanged, decreased in the amount of any money received by the taxpayer and increased in the amount of gain or decreased in the amount of loss to the taxpayer that was recognized on such exchange. * * *

[25]The parties agree that the partnership terminated as a result of the exchange of the 50-percent interest under sec. 708(b)(1)(B). Respondent did not argue that the termination caused the exchange to fall outside of sec. 1031, and we see no reason why it should. We consider this to be the correct result especially in view of the statement contained in sec. 1.708–1(b)(1)(iv), Income Tax Regs., that immediately after the distribution of property by the terminated partnership the new partners "contribute the properties to a new partnership, either for the continuation of the business or for its dissolution and winding up."

[26]The sequence of the termination of the old partnership and formation of the new partnership as a result of a termination is set forth in sec. 1.708–1(b)(1)(iv), Income Tax Regs.

reduced by any money received.[27] Thereafter, a new partnership is deemed to be formed by petitioners and it is entitled to this stepped-up basis under section 723 upon the constructive contribution of that property by petitioners. Rather than dissolve and wind up this new partnership, they continued to operate it together as 50-percent owners.

On the other hand, respondent argues that petitioners are not entitled to a full step-up in basis equal to the amount of gain recognized. Respondent points out that petitioners were allocated losses from the Lincoln Property partnership in excess of their cash contribution due to their share of the liabilities, which resulted in a negative capital account balance on May 9, 1975, of $369,358 each or a total of $738,716. To the extent of their negative capital account in Lincoln Property, petitioners should not be entitled to a step-up in basis on liquidation of Venture Twenty-One because this would in effect allow them a double benefit from the partnership liabilities. This would occur because the gain recognized on the exchange in an amount equal to their negative capital account, which respondent calls "phantom gain," represents the recovery of the prior tax deductions which originally produced the negative capital account. As this recognition of gain then represents the inevitable recovery from the taxpayer for past tax benefits, it should not now again be used by the taxpayer to increase his basis in the property received so as to cancel out this recovery. If this were allowed, respondent contends that this "phantom gain" will never be recovered and will effectively result in a tax-free bailout from the previous partnership.

We fail to see how petitioners' negative capital account produced this "phantom gain" much less how this will allow petitioners a tax-free bailout from Lincoln Property. In computing petitioners' basis in their partnership interests, we used the alternative method authorized under section 705(b) and section 1.705–1(b), Income Tax Regs. Under this method, their basis equaled their negative capital account plus their share of the liabilities. Accordingly, their basis in both

---

[27]Sec. 732(c) provides that the basis of the partners' interest in the partnership is allocated first to any unrealized receivables and inventory items, as defined in secs. 751(c) and 751(d)(2), respectively. The remaining basis is allocated to the other assessts distributed in proportion to the bases of such assets in the hands of the partnership before the distribution.

partnerships was reduced to the extent of their negative capital account. This reduction had the effect of increasing the amount of gain realized on the exchange of their Lincoln Property interests and decreasing the adjusted basis in their original 50-percent interest in Venture Twenty-One. Having utilized this method, respondent cannot now reasonably contend that petitioners' negative capital account has been somehow transformed into "phantom gain" which will allow petitioners to escape tax because of the deductions which produced their negative capital account. We fully agree with petitioners' analysis of the relevant statutes and their conclusion that they are entitled to a full step-up in basis as provided in section 1031(d) due to the recognition of gain on the exchange of partnership interests.

Although the basis increase is mandated under the statute, it is apparent that petitioners' new basis in Venture Twenty-One provides them with a tax benefit which will be realized over the remaining life of the Venture Twenty-One assets. This benefit can be briefly explained as follows. While the dollar values of the two partnerships were far from equal, there were certain other factors which persuaded both sets of partners to agree to a simple exchange of their respective interests, most notably, the fact that Lincoln Property was in default on its mortgage and it had a very large negative cash flow. As a result, the parties treated the exchange as being equal and petitioners received the smaller, but more financially secure, partnership and were relieved of a much larger amount of liabilities than they assumed. With the excess of liabilities relieved treated as boot under section 1031(b), all of the gain realized was then entitled to a step-up in basis in the 50-percent partnership interest received. This basis increase was converted into a step-up in the basis of the assets of Venture Twenty-One because the partnership terminated under section 708(b)(1)(B) and the partners' basis became that of the assets received on liquidation under section 732(b). The event that caused the basis increase was the large relief from liabilities of the Lincoln Property partnership coupled with the section 1031(d) increase in basis. Therefore, at the price of a tax at capital gains rates, the taxpayers will be entitled to greater depreciation deductions which will be offset against future ordinary income.

At the date of the exchange, the Venture Twenty-One property was valued at \$600,000. The total consideration transferred for this property was \$1,929,884 less the adjusted basis, liabilities assumed and cash paid for property taxes totaling \$1,075,928 for a gain realized of \$853,956.[28] The liabilities relieved of \$1,426,681 less liabilities assumed of \$376,947 result in total boot received under section 1031(b) of \$1,049,734 and, therefore, the entire gain realized is recognized. After adding the full amount of gain recognized to their adjusted basis under section 1031(d), petitioners' ending adjusted basis in Venture Twenty-One equals \$829,458.

Although the result herein seems to present an unintended benefit, this may not in fact be the situation. If the Lincoln Property partnership has taken accelerated depreciation, then

---

[28]The computation of petitioners' gain recognized and adjusted basis as a result of the exchange is as follows:

### GAIN RECOGNIZED

| | | |
|---|---:|---:|
| *F.M.V. of property received (50% interest) | | \$503,203 |
| Liabilities relieved | | 1,426,681 |
| Total consideration received | | 1,929,884 |
| *Less:* | | |
| Adjusted basis of property surrendered | \$687,966 | |
| Liabilities assumed | 376,947 | |
| Cash paid—property taxes | 11,015 | 1,075,928 |
| Gain realized | | 853,956 |
| Sec. 1031(b) boot received on exchange: | | |
| Liabilities relieved | 1,426,681 | |
| Less: Liabilities assumed | 376,947 | |
| Total boot received | 1,049,734 | |
| Gain recognized | | 853,956 |

### ADJUSTED BASIS

| | | |
|---|---:|---:|
| Adjusted basis of property surrendered | 687,966 | |
| Liabilities assumed | 376,947 | |
| Cash paid—property taxes | 11,015 | 1,075,928 |
| *Less*: Liabilities relieved | | 1,426,681 |
| *Plus*: Amount of gain recognized | | 853,956 |
| Basis of property acquired | | 503,203 |
| **Plus*: Basis of property previously owned | | 326,255 |
| Adjusted basis in partnership after exchange | | 829,458 |

---

*The apartment was valued at \$600,000 and the other assets were cash, \$6,301, and investments and deposits, \$400,105.

**We assumed the figures supplied by Touche Ross & Co. were correct and therefore had to adjust petitioners' ending negative capital account so that the figures would balance. Accordingly, petitioners' adjusted basis was equal to their negative capital account of \$50,692 plus one-half of the liabilities of \$376,947.

section 751 would convert the gain on the sale or exchange into ordinary income.[29] Also, the property received in liquidation from the partnership would then be treated as "used property" under section 167(c)(2) and section 1.167(c)–1(a) and (b), Income Tax Regs., so that the recipient partners could not elect to use accelerated methods of depreciation. Finally, the taxpayer has paid the tax at the time of the exchange on the increase in gain due to his relief of liabilities in the larger partnership.

The final issues presented are whether petitioners are liable for the minimum tax imposed on tax preference items under section 56(a) and whether they are entitled to income averaging. These issues are dependent on the determination of whether petitioners recognized gain on the like-kind exchange. In view of our above decision, these two issues can properly be resolved under Rule 155.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*

---

[29]See the discussion of the determination of ordinary income under sec. 751 *supra.*